685 P.2d 1347

Kenneth H. PRUITT and R. Eileen Pruitt, husband and wife, and The Old Mill, Inc., an Arizona corporation, Plaintiffs-Appellees,

v.

Carole PAVELIN; C & A Realty Co., Inc., an Arizona corporation; St. Paul Fire and Marine Insurance Company, a Minnesota corporation, Defendants-Appellants.

No. 1 CA–CIV 6017.

Court of Appeals of Arizona, Division 1, Department D.

June 19, 1984.

Sorenson, Moore, Benham, Garrett & Julian by J. William Moore, Phoenix, for plaintiffs-appellees.

Udall, Shumway, Blackhurst, Allen, Lyons & Davis, P.C. by John H. Lyons, Steven H. Everts, Gregory L. Miles, Mesa, for defendants-appellants C & A Realty and St. Paul Fire & Marine Co.

Brian W. Hendrickson, Tempe, for defendant-appellant Carole Pavelin.

## OPINION

KLEINSCHMIDT, Judge.

This appeal arises out of the actions of a real estate salesperson who defrauded the seller of a restaurant by forging certain signatures on a sales contract and security documents. It presents a number of evidentiary and legal issues that we will discuss separately after we set forth the facts. The trial court found against the salesperson, Carole Pavelin, in the amount of $158,698.33 compensatory damages and $100,000 punitive damages. It found

against Pavelin's employer, C & A Realty, on a theory of *respondeat superior* for Pavelin's fraudulent and willful misrepresentations and acts and awarded $158,698.33 compensatory damages and $100,000 punitive damages. It further awarded compensatory damages in the amount of $158,698.33 and punitive damages in the amount of $25,000 against C & A Realty on the plaintiff's claim that C & A had been negligent in hiring Pavelin.

## EMPLOYMENT AND LICENSING OF SALESPERSON

In August of 1977, Carole Pavelin was employed by C & A Realty Company, Inc. as a real estate salesperson. Sometime in 1977, Pavelin and C & A discussed the possibility of employment. Pavelin's first contact with C & A Realty was with one of its agents named Hicks. Rudolph Hess, the sales manager for C & A Realty, talked to Hicks and with two people at Coldwell Banker, Pavelin's former employer. The people at Coldwell Banker spoke well of Pavelin as a salesperson. Hess also learned that Pavelin was the daughter of H.A. Hendrickson, who had an excellent reputation in the community. Hess also checked with the Arizona Real Estate Department to see if Pavelin could be licensed and was told that she could be with 12 hours of schooling. The real estate department did not relate anything to Hess about investigations of Pavelin that were then underway.

Rudolph Hess had discussed with Pavelin the fact that she had forged a document in connection with a real estate transaction in which she had been involved when she worked for Coldwell Banker. She admitted the forgery. He was also aware of the fact that Pavelin had previously been convicted of passing insufficient funds checks and that a lawsuit was pending against Pavelin in connection with still another real estate transaction.

When Pavelin was hired she did not have a real estate license. C & A Realty had given Pavelin a check to obtain her license and she told C & A that she had taken care of everything and was ready to work. In fact, Pavelin did not obtain the license. After C & A Realty discovered that Pavelin had not obtained her license, she filed a Salesman Renewal Application. This application reflected that she had been charged with and convicted of a criminal offense, insufficient funds checks, and that she had been sued in a matter involving a real estate transaction.

Richard Campbell, the designated broker for C & A Realty, wrote a letter to the Arizona Real Estate Department in support of the Salesman Renewal Application. This letter was delivered to the real estate department by Hess, who was aware of its contents. In the letter Campbell stated that he had complete confidence in Pavelin's honesty and certified that in his opinion Pavelin was truthful and of good character. C & A did not tell the real estate department that Pavelin had admitted forging signatures while employed at Coldwell Banker.

Paul Middlebrook, the Deputy Commissioner for the Licensing Division of the Department of Real Estate of the State of Arizona, reviewed Pavelin's renewal application and determined that a new license would be issued to her. Prior to issuing the license he noted the "yes" answers to questions on the renewal application concerning criminal conduct and lawsuits in progress. He issued the license in spite of the convictions for insufficient funds checks because he did not consider that to be the type of offense which would preclude a person from selling real estate in the absence of a repeated pattern of misconduct. Since the lawsuit was still pending, Middlebrook did not believe that it should bar the applicant. Middlebrook also reviewed a report showing that the department was investigating a complaint concerning possible unlicensed activity. He saw a severance report from Coldwell Banker indicating that Pavelin had been dismissed as a result of her having signed certain documents without authorization. Middlebrook also had a severance notice from another real estate company together

with a letter which referred to unusual attempts at renewing a license and confusion as to whether Pavelin was licensed. The contents of the real estate department's files were confidential and not open to inspection by C & A Realty. Middlebrook testified, however, that he would not have routinely issued a license to a salesperson if the broker had told him that an applicant for the license had admitted forging documents in connection with a real estate transaction.

## THE SALE TRANSACTION

In the fall of 1977, the appellee, Kenneth Pruitt, entered into a listing agreement with Durwood Miller, a real estate salesman employed by Century 21. The agreement allowed Miller to sell The Old Mill, a restaurant that Pruitt owned. The listing was limited to only a few buyers, two of whom were R.C. Corbett and Ben Hawkins. Miller was to receive a ten percent commission on a sales price of $200,000.

A short time after he obtained the listing, Miller contacted Corbett and arranged for Corbett to visit the restaurant. Pavelin, who was living with Corbett at the time, accompanied him on the visit. According to Miller, Pavelin did not, on this occasion, mention that she was a realtor, give Pruitt her business card or seem to be acting as a realtor. Instead, she appeared to be a subprincipal or advisor with respect to running the restaurant business.

Pavelin subsequently contacted Pruitt and his attorney, Lee E. Esch, and advised them that she was employed by C & A Realty and represented people who were interested in buying The Old Mill. She identified these people as Corbett, Hawkins and H.A. Hendrickson. At various times during the negotiations, she represented to Pruitt: that Corbett and Hawkins were in the process of getting a loan; that Hawkins, a football player, was to receive a bonus from the Philadelphia Eagles; and that Hendrickson, who would not be active in the business, would be providing financial backing for the enterprise. She also provided Pruitt with a financial statement

purportedly signed by Hendrickson. The statement listed a motel in Snowflake, Arizona, owned by Hendrickson which could be used as security. Hendrickson, in fact, had never signed the financial statement and knew nothing about the transaction. On December 6, 1977, Pruitt obtained a title report on the Hendrickson motel and personally went to look at the motel.

On December 20, 1977, before completion of all the paperwork, Pruitt turned over possession of the restaurant to the buyers and Pavelin turned over the sales documents to Esch. The documents bore the signatures of Corbett and Hawkins and the forged signature of Hendrickson.

The agreement, which Esch drafted, required the buyers to fulfill a number of obligations. They were to: make a $10,000 down payment; assume the leases on the equipment located at The Old Mill; assume the lease on the real property; and Hawkins and the Philadelphia Eagles were to assign Hawkins' $70,000 bonus to Pruitt. This assignment was a prerequisite to the release of $80,000 worth of certificates of deposit which the sellers had pledged to secure General Leasing on the equipment leases. The assignment of the bonus was also a condition precedent to the sellers' obligation to perform.

The agreement further provided that Miller and Century 21 were to release their right to a commission arising from the sale of The Old Mill. This also was an express condition precedent to Pruitt's obligation to perform. The agreement did not refer in any way to Pavelin or C & A Realty.

As additional security, Pavelin had provided Esch and Pruitt with two signed deeds of trust, one to be on the motel owned by Hendrickson and the other to be on a condominium owned by Corbett. The legal description of the property on each deed of trust was left blank and Pavelin instructed Esch not to insert the legal description on or record either deed of trust until she authorized him to do so. Esch never asked Pavelin for such permission and he conceded that these deeds of trust were never perfected. Esch would not cat-

egorically say that he would not have turned over documentation to Pavelin to procure signatures if he had known she was not a licensed salesperson. He said he might have done so if he knew that she had some relationship to the parties and if he knew her to be trustworthy. He said that because such chores are a customary function of real estate salespeople that he did not question the propriety of turning over the documents to Pavelin. Finally, he said that he would probably not have dealt with Pavelin in the manner he did had he not believed her to be a real estate salesperson working for a broker.

Pruitt wanted the transaction to close because he wanted to return to California to be with his family before the Christmas holidays. He decided to transfer possession of the restaurants to the buyers before completion of all the paperwork. On the night of December 19, 1977, Pruitt took inventory of the property, received a down payment of $2,000 on the morning of December 20, 1977, and gave possession of the restaurant to the buyers.

Following the transfer of the property, Pruitt took the signed agreement to California with him. Neither Pruitt, his wife, nor his partner, signed the agreement when it was first presented because no down payment had been made and there had been no performance by the buyers. Pruitt did not want to bind himself until he knew that the purchasers were going to perform. Pruitt eventually did sign some of the documents relating to the sale but instructed Esch to hold them until the buyers had performed. He never did sign all of the documents.

Neither Pruitt nor Esch nor Miller spoke to anyone at C & A Realty about the transaction. Pruitt, however, said that a commission was discussed with Pavelin and Esch testified that Pavelin told him that her broker was negotiating with Miller's broker regarding the commission. There was evidence that Pavelin had told Durwood Miller that she wanted half of the commission to be received from the sale of the restaurant. Miller testified that if the

commission had been split, under the laws governing such matters, some money would have gone to Pavelin's broker. As the transaction Pavelin proposed took shape, however, the buyers would not pay enough cash to cover the commission. Pavelin showed Miller a deed of trust that she represented would cover the payment of a commission. Miller also testified that the commission issue was never resolved. He said that whether the money would go to Pavelin's broker was just a matter of conjecture.

While C & A Realty at all times denied that it expected a commission, both Rudolph Hess and Richard Campbell of C & A Realty testified that after December 20, 1977, Pavelin was spending a lot of time at The Old Mill restaurant. According to Hess, he asked Pavelin if C & A was involved in the deal. She denied that it was and said that C & A was not going to receive any commission. Hess admitted that when he questioned Pavelin about the reason that she was spending so much time at The Old Mill, he was not satisfied with her explanation and suspected that there were problems with C & A's involvement in The Old Mill transaction.

The only evidence that C & A Realty was to receive a commission on The Old Mill transaction came from Carole Pavelin. Counsel for Pruitt read a portion of Pavelin's earlier deposition taken by Lee Esch into the record. The questions and answers were as follows:

Question: Isn't it true that you informed me, as Counsel for The Old Mill and Mr. Pruitt, that the magnitude of Durwood's commission was getting in the way of consummating a sale, and that there was some questions about whether he was entitled to the entire commission, and that your broker and his broker had been engaging in a continuing dialogue with a view toward resolving some of these problems?

Answer: You have opened up an area that I had forgotten even about, in that, yes, we did discuss the size of the commission. And I do think there was con-

cern on the part of Rudy Hess at C & A as to whether or not this transaction would go because of the size of the commission.

And I think that Rudy's concern was that this activity was taking up my time and he would rather have had me selling, actively selling real estate. I do not know if Rudy ever spoke directly to Durwood's broker. I think Rudy may have spoken to Durwood, but I don't know if he did.

However, when Pavelin testified at trial, she said she considered herself the vicarious buyer of the restaurant because of her relationship with Corbett. She admitted that she had had a conversation with Esch in which he tried to clarify her position and she told him that because Corbett and Hawkins were inarticulate she did the speaking for them. She testified that it was never intended that C & A Realty ever receive a commission on the sale.

The buyers, Corbett and Hawkins, never operated the restaurant successfully. They disagreed among themselves and defaulted on the contract. Pruitt ultimately paid $158,698.33 to satisfy his obligation to General Leasing. The trial court applied the benefit of the bargain rule and found that had Pavelin's representations been true that Pruitt could have satisfied his losses from Hendrickson's assets.

NEGLIGENT HIRING

The court found C & A liable for negligently hiring Pavelin. The appellants originally argued that this amended claim was barred by the statute of limitations and did not relate back to the original cause of action. They abandoned their position in this respect at oral argument.

The court's ruling was based upon what the officers of C & A knew about Pavelin that called her honesty into question. There is a split of authority among a number of jurisdictions as to whether such a tort is recognized, See 53 Am.Jur.2d Master and Servant § 422 (1970), and the Arizona cases themselves cast some doubt on the matter. The first Arizona case ever to

deal with this topic appears to be *Lewis v. Southern Pacific Co.*, 102 Ariz. 108, 425 P.2d 840 (1967). There the plaintiff brought an action against the railroad and one of its locomotive engineers to recover for the wrongful death of her husband. The plaintiff offered to prove that on two occasions before the accident the engineer had been cited for violating the speed limit and that he had been involved in a crossing collision with a motor vehicle seven years prior to the accident in question. She sought to prove that the railroad had hired an incompetent employee and had permitted him to operate its train. The evidence concerning the engineer was excluded, a ruling ultimately upheld by the supreme court which commented:

> If the defendant employees were actually negligent at the time of the accident and proximately caused the accident, this is sufficient to establish the railroad's liability. But the failure of an employer to hire only competent and experienced employees does not of itself constitute an independent ground of actionable negligence.

102 Ariz. at 109, 425 P.2d at 841.

After *Lewis* was decided, however, Division 2 of this court considered a similar question. In *McGuire v. Arizona Protection Agency*, 125 Ariz. 380, 609 P.2d 1080 (App.1980), the defendant employer had contracted to install a burglar alarm in the plaintiff's home. The employee who installed the alarm had a history of criminal activity. After the alarm was installed and after the employee's job with the defendant had been terminated, the employee returned to the plaintiff's home, disconnected the alarm, and burgled the home. Without ever mentioning the *Lewis* case, the court held that a cause of action for negligent hiring could exist under these circumstances and reversed the trial court's order dismissing the action for failure to state a claim.

While *Lewis* is a supreme court case, we find the reasoning of *McGuire* better fits the present situation. In *Lewis*, the court had no need to consider the consequences

of acts arguably committed outside the course and scope of employment. It is clear that the court in *Lewis* thought it sufficient that the employer could be responsible under the doctrine of *respondeat superior*. *McGuire* specifically considered a situation where *respondeat superior* is not applicable.

 We have not found a case precisely on point. The trial judge was correct in holding the employer liable on a theory of negligent hiring. The legislature has enacted the licensing statutes to protect the public from unscrupulous and unqualified persons. *Whitaker v. Arizona Real Estate Board*, 26 Ariz.App. 347, 548 P.2d 841 (1976). To provide that protection, the legislature requires that all real estate salespersons be licensed. A.R.S. § 32–2122(A). The legislature defines a "real estate salesman" as a "natural person engaged by or on behalf of a licensed real estate broker....", A.R.S. § 32–2101(27), and requires that the salesperson accept employment and compensation only from a legally licensed broker. A.R.S. § 32–2155(A). Thus, the statutes provide that a salesman must work under the direction of a broker. According to a regulation in effect at the time of the transaction in question, a salesman was to hold only one license and that license was to be issued to his broker. Ariz.Admin.Comp.R. R4–28–02(C) (repealed May 1, 1980). In addition, the regulation, in effect in 1977, provided:

> Licensees shall protect the public against fraud and misrepresentation in the real estate field and shall assist the Real Estate Department in regulating the practices of licensees.

Ariz.Admin.Comp.R. R4–23–20(A) (repealed May 1, 1980). While the regulations did not address the meaning of assist, it would seem to encompass a situation such as this. Instead of assisting the department, the broker actively helped an employee, known to be dishonest, obtain a license to ply a trade which put the employee in a position where the public entrusted her with, and received from her, important documents and relied upon her to deal with them honestly. The employer actively and knowingly put it within the power of a dishonest employee to work a fraud upon the plaintiff.

Cases from other jurisdictions are of some assistance. A number are quite similar to *McGuire v. Arizona Protection Agency, supra*. *See Pontiacs v. KMS Investments*, 331 N.W.2d 907 (Minn.1983) (tenant raped by the manager of an apartment had a cause of action against the owner of the apartment who had trusted manager with passkeys without investigating his background.) *See also Williams v. Feather Sound, Inc.*, 386 So.2d 1238 (Fla. 1980); *C.K. Security Systems, Inc. v. Hartford Accident & Indemnity Co.*, 137 Ga.App. 159, 223 S.E.2d 453 (1976); *Weiss v. Furniture in the Raw*, 62 Misc.2d 283, 306 N.Y.S.2d 253 (1969).

 An employer will not be liable for an act of an employee that was not foreseeable. In *Edwards v. Robinson-Humphrey Co., Inc.*, 164 Ga.App. 876, 298 S.E.2d 600 (1983), for example, the court found that an employer who hired a bond salesman who had lied about his credentials and qualifications was not liable to a customer who had purchased bonds because the salesman had threatened her physically if she did not. The court specifically pinned its decision upon the fact that the employer's knowledge that the salesman had lied would not have put the employer on notice that the man was of a violent nature. Presumably, had the salesman committed a crime of dishonesty, as opposed to violence, the court would have found liability.

The foregoing cases are of some help because the real estate license in issue here is, for example, analogous to the passkey in the *Pontiacs* case. It was something given to the employee without which the employee probably could not have accomplished the wrongful act.

In the instant case, C & A Realty knew that Pavelin had forged a signature on a document, knew that she had been convicted of passing insufficient funds checks, and knew that she had lied to officers of that company about obtaining a license. Even

after learning of these things, the broker for C & A wrote the real estate department and manifested complete confidence in Pavelin's honesty. It was easily foreseeable that an employee so casual with the truth would use her position to cheat members of the public with whom she dealt.

It is true that Esch had no direct contact with C & A and that there is no evidence that he relied on their reputation. He had, however, been given business cards that represented Pavelin as a salesperson for C & A and he said he had no occasion to question whether Pavelin was acting as a duly licensed salesperson in connection with this transaction. Esch wrote a letter to Pavelin addressed to her at C & A Realty. With respect to his reliance on Pavelin as a salesperson, Esch was asked by counsel for Pruitt:

Q. Going back to the time you dealt with Carole Pavelin on this matter, and you have testified that you turned documents over to her to take to be signed by the various parties, buyers and so forth, would you have done that and entrusted those documents to her for those purposes had she not been a licensed salesperson, a licensed real estate salesperson?

A. Oh, I would not tell you categorically that I would not have. If she would have had some other relationship to the parties that was known to me, and if I knew her to be reputable and trustworthy. No, I wouldn't say that I would not under any circumstances have acted as I did if she were not a real estate salesperson.

What I can say to you is that it is so routine, so usual to permit real estate sales people to run errands of this nature, as a part of services that they render in earning their commission, that I did not question the propriety of using that procedure.

Q. Well, let me just ask you this: Would you have dealt with her in the manner you did had she just been a person saying she represents A, B and C, the buyers, rather than by saying she

was a real estate salesperson working for C & A Realty and representing the buyers? Do you see what the difference is?

A. And she was not in their employ and I didn't know anything about her?

Q. That's right.

A. Oh, perhaps not. *Probably not.*

(emphasis added).

While Esch may have known that Pavelin had friends involved in the transaction, we have found no testimony that would suggest that he had previously been acquainted with her or had independent knowledge that she was trustworthy. The trial judge had sufficient evidence before him to support the conclusion that Esch relied on the fact that Pavelin was a licensed salesperson. In addition, Pruitt himself testified:

Q. In fact, even if Carole hadn't been a realtor it wouldn't have made an awful lot of difference whether you went ahead and transferred the restaurant to Mr. Hendrickson, Mr. Corbett and Mr. Hawkins, would it?

A. If she hadn't been a realtor?

Q. Right.

A. I don't think I would have went along with it, no.

Q. You don't think you would have?

A. No.

Q. Why?

A. Well, I was doing business with a realtor and I doubt if I would have went along with it.

Q. What specific thing did Carole do as a realtor in this case, as opposed to, you know, just any other person?

A. Well, she knew what she was doing. She was experienced.

Q. In the transfer of real property or business?

A. In her approach to me, that she was experienced and knew what she was doing.

The patina of reliability that the licensing process imparts to a salesperson is sufficient nexus between Pavelin's fraud and her employment by C & A to establish liability.

## RESPONDEAT SUPERIOR

The trial court also found that Pavelin was the agent of C & A Realty when she defrauded Pruitt and held C & A liable on a theory of *respondeat superior.* C & A Realty argues that the evidence will not support that finding. It says, citing *Barnes v. Lopez,* 25 Ariz.App. 477, 544 P.2d 694 (1976); *Jerger v. Rubin,* 106 Ariz. 114, 471 P.2d 726 (1970), and *Carrel v. Lux,* 101 Ariz. 430, 420 P.2d 564 (1966), that cases allowing recovery against brokers for the misstatements of their salesmen share the following four elements in common: 1) The broker had a listing and presumably received a commission; 2) The salesman represented the seller and not the buyer; 3) The agreement for sale was consummated and legally enforceable, and 4) The misrepresentations concerned the property itself. These, they say, are lacking here so that the broker does not share liability.

With respect to the lack of a listing agreement or the receipt of a commission, it is correct that C & A Realty never actually had a listing agreement or received a commission. In view of what Durwood Miller testified to about the splitting of commissions between brokers we do not find the lack of a listing agreement determinative. We defer our discussion of the significance of a commission until after we consider all other factors bearing on this issue.

We do not consider it material that in the cases where brokers have been held liable their salesmen were representing sellers instead of buyers. While most cases may be presented in that posture we see no reason to draw a distinction on that basis.

■ Nor do we consider the fact that the agreement was not technically consummated to be fatal to Pruitt's claim. As we view the evidence several things remained to be done, i.e., there were no legal descriptions in the deeds of trust, Pruitt had failed to sign all of the documents, Hawkins had not received his bonus, and the assignment of the equipment leases had not been accepted. As a general rule, a party may waive any provision of a contract intended for his sole benefit. *Nelson v. Cannon,* 126 Ariz. 381, 616 P.2d 56 (App.1980). Upon examination of the record we find that everything that remained to be done was for Pruitt's benefit. For example, although Hawkins failed to receive a bonus and the contract provides that Pruitt can cancel under that circumstance, such failure does not relieve Hawkins of any obligation. The failure to gain approval of the assignment of the equipment leases or insert a legal description in the deed of trust is not controlling. These provisions were intended to protect Pruitt. He transferred the property only after the appellants had executed the contract. We find that Pruitt merely waived his right to insist on these provisions. *See Nelson v. Cannon, supra.*

We disagree with the contention that the contract is not legally enforceable. Although Pruitt failed to sign the contract, the statute of frauds has been satisfied. The appellants signed the contract and that is sufficient. A.R.S. § 44–101; *see Young v. Bishop,* 88 Ariz. 140, 353 P.2d 1017 (1960).

■ The appellants argue that to create liability on the part of the broker, the salesman's misrepresentation must pertain to the property itself. They rely on *Larson v. Bear,* 38 Wash.2d 485, 230 P.2d 610 (1951), which they say has been followed by the courts of this state. *Larson* stands for the proposition that real estate sales agents do not have implied authority to make contracts or make representations as to the quality of property but are limited to finding a purchaser, identifying the property, and showing it to him. We do not believe that the salesperson's implied authority is as strictly limited as appellants suggest. A.R.S. § 32–2101(27) defines "real estate salesman" as a person engaged by a real estate broker to perform acts or participate in transactions in the manner included in the definition of real estate broker. A.R.S. § 32–2101(25) defines real estate broker as one who, among other things, assists in the negotiation of transactions for the sale of land. There was competent evidence that

real estate salespeople customarily procure the signatures of parties on documents to facilitate transactions. A representation is apparently authorized if the third party reasonably believes from the conduct that the agent is authorized to make the representations in question. *Restatement (Second) of Agency* § 257 comment a (1958).

The cases which the appellants say follow the narrow rule of *Larson v. Bear* are not really in point. All of them hold that a broker is liable for the false statements his salesman makes about property. They do not discuss whether a broker may be liable for other false statements arising out of the transaction that do not directly pertain to the property sold. None of them discuss *Larson v. Bear. Compare Carrel v. Lux, supra; Jerger v. Rubin, supra,* and *Barnes v. Lopez, supra.*

 The appellant has, however, pointed out in general terms that an employer is vicariously liable only for the behavior of an employee who was acting within the course and scope of his employment. *Leigh v. Swartz,* 74 Ariz. 108, 245 P.2d 262 (1952); *Conchin v. El Paso & S.W.R. Co.,* 13 Ariz. 259, 108 P. 260 (1910). These cases do stand for the proposition that where the employee is acting solely on his own behalf and not in concert with his employer, no vicarious liability will attach. We must review the evidence and every inference arising from it in the light most favorable to the prevailing party. *McFarlin v. Hall,* 127 Ariz. 220, 619 P.2d 729 (1980). It is, however, the role of the appellate court to determine whether there is substantial evidence to support the judgment. *Siegrist v. Carrillo,* 112 Ariz. 218, 540 P.2d 690 (1975). There is no substantial evidence from which the trial court could have reasonably concluded that Pavelin was doing anything but pursuing her own interests in an illegal manner. The only evidence upon which a finding of vicarious liability could be based was:

1) Pavelin's deposition testimony from which it could be inferred that Rudolph Hess of C & A was concerned about the commission. Pavelin directly contradicted this in her trial testimony.

2) Hess was aware that Pavelin was spending time at the restaurant and was suspicious of just what Pavelin's involvement was.

If there was no substantial evidence that C & A was to receive a commission, there is no basis for the finding that Pavelin was acting within the course and scope of her employment. While one might well believe that Pavelin intended to extract a commission, given her history of deceit and forgery, there is no reason to believe that C & A knew or ever would have known anything about it. There is so much evidence of Pavelin's deception that no reasonable fact finder could place much reliance on anything she said. The judgment predicated on vicarious liability resulting strictly from the agency relationship must fall.

## SUFFICIENCY OF THE EVIDENCE RELATING TO FRAUD

The appellants claim that Pruitt did not sufficiently prove fraud. Their first argument is that fraud was not sufficiently alleged. They rely on Rule 9(b), Arizona Rules of Civil Procedure, which requires that averments and circumstances constituting fraud be set forth with particularity. They point out that the second amended complaint simply contains the allegation that Carole Pavelin forged her father's signature on the agreement to purchase the property and failed to allege anything with respect to forgeries on the deed of trust relating to the Snowflake Motel or on Hendrickson's financial statements. The appellants go on to say that Pruitt never made a motion to amend the complaint to conform to the evidence pursuant to Rule 15(b), Arizona Rules of Civil Procedure, and that they did not expressly or impliedly consent to the trial of issues which were not raised in the complaint. This, they argue, made it improper for the judge to consider anything in connection with the allegation of fraud except Hendrickson's forged signature on the agreement. They then proceed to argue that such is not enough to show

fraud because Pruitt did not receive the signed agreement until he had begun the actual transfer of possession of the restaurant.

 The whole case was tried upon a theory of fraud based upon facts which were admitted into evidence without objection and which were not confined to the presentation of the agreement with Hendrickson's signature on it. Evidence was received that Pavelin represented that Hendrickson was to be one of the buyers, that he was the principal source of financial backing, and that he would encumber his property to secure payment. The findings of fact and conclusions of law adopted by the judge were obviously based upon all of this evidence. Most significant, the appellants do not suggest any way in which they were prejudiced by the insufficiency of the pleadings. The record shows that all of the facts which were ultimately admitted into evidence were developed during discovery and there has been no claim of surprise. Since the purpose of Rule 9(b), Arizona Rules of Civil Procedure, is to eliminate surprise, *Fruth v. DiVito*, 26 Ariz.App. 154, 546 P.2d 1163 (1976), under the circumstances of this case the insufficiency of the pleadings should not require reversal. *See Payne v. United States*, 247 F.2d 481 (8th Cir.1957); 5 Wright and Miller, *Federal Practice and Procedure* § 1300· (1969).

 The appellants argue that no actual reliance was shown because Pruitt could not have relied on Hendrickson's signature on the agreement since he, Pruitt, had begun to transfer the property before December 20, the date which the agreement bears. This argument ignores the fact that Pruitt specifically testified that he would not have turned the business over to the buyers on December 20 if he had known that Hendrickson was not in fact one of the buyers.

 The appellants then say that in any event Pruitt had no right to rely upon the misrepresentation. They again point out that Pruitt had actually begun to transfer

the property before he received the signed document and that the deeds of trust which were signed by Hendrickson were actually blank. Each had been instructed not to fill in the property description on these documents until he had received the express permission of Pavelin. Thus the alleged misrepresentations were arguably mere promises as to what was to occur in the future and cannot be the subject of actionable fraud. The appellants' interpretation of the evidence on this point is not precisely correct. It is clear that one of the misrepresentations, that Hendrickson was one of the three buyers, was a representation of a present fact. It is true that Pavelin told Pruitt's attorney not to fill in the property description on the deeds of trust until he had her express permission to do so. There is no explanation in the record of any reason given for this reservation, but we think that under all the circumstances of the case it can fairly be inferred that Pavelin was telling Pruitt that the deeds of trust had in fact been signed by Hendrickson, a misrepresetnation of a present fact, and that she would grant permission in the future to have them completed and recorded. Since Hendrickson knew nothing whatsoever about the transaction, it is obvious that the presentation of the signed deeds was a hybrid misrepresentation of present fact on the one hand and of what was to occur in the future on the other. Since Pavelin knew beyond any doubt from the beginning that the deeds of trust were worthless, the misrepresentation was actionable. *Sun Lodge, Inc. v. Ramada Development Co.*, 124 Ariz. 540, 606 P.2d 30 (App.1979).

The argument that Pruitt had no right to rely upon signature placed on documents that were not presented until after the transfer had begun is not persuasive. The point is that the documents presented were presented before the transfer was completed and remained as evidence of a viable obligation after Corbett and Hawkins took delivery and attempted to commence business. The appellants claim that the statute of frauds precludes Pruitt from relying upon the written agreement because the

decision to transfer the property was made before the agreement was signed. This, they say, makes the agreement an oral one which cannot be enforced. This, too, ignores the fact that before the transfer was consummated the signed agreement was in fact in Pruitt's possession.

The appellants contend that Pruitt was not entitled to rely on Pavelin's representations because the deeds of trust, which bore no description of the property to be encumbered, were invalid under A.R.S. § 33–802. Their point would be far stronger had not Pruitt had an enforceable contract with Hendrickson's purported signature on it. Pruitt testified that he would not have proceeded with the sale if Hendrickson had not been a buyer. He had reviewed Hendrickson's financial statement and, while he did not rely on that exclusively, it was one of the things he took into consideration in deciding to go ahead with the sale. It is fair to say that Pruitt, who knew the status of the title to Hendrickson's motel and who had actually seen the motel, believed that property was a sufficient asset to protect him in the transaction. Pruitt said that he first learned at trial that the security had not been perfected before the sale was consummated. While Esch clearly knew that the deeds of trust were incomplete, he was not certain whether he had specifically communicated this to Pruitt. It was Esch's "best guess" that Pruitt proceeded even though the documents weren't in the condition that he, Esch, would have liked them to be. While Pruitt said he let the buyers into possession because he had an agreement that Hawkins' bonus would be assigned to him and had an agreement on the motel as collateral, and that he was relying on the promise that the motel would be put up for collateral, he was never asked at trial whether or not he would have proceeded with the transaction without the security agreements. Since he had what he justifiably believed to be an enforceable agreement with a man with sufficient assets to satisfy the obligation, the trial court's conclusion that:

[H]ad the representations of Pavelin as set forth above, been true, Plaintiffs would have been able to satisfy their losses *from the assets of Hendrickson* and from the hypothecation or pledge of Hendrickson's assets and these assets would have been more than sufficient in value to cover Plaintiffs' losses.

(emphasis added). We agree with the trial court that Pruitt had a right to rely on Pavelin's representations.

## PUNITIVE DAMAGES

■ The appellants argue that the punitive damage award was improper because only wanton misconduct or gross negligence which indicates a reckless disregard of the rights of others will support such an award. We think that C & A's active assistance in procuring a license for Pavelin, by asserting that she was honest when officers and employees of the company knew she was not, will support an award of $25,000 for punitive damages.

■ The appellants argue that the trial court was unduly influenced in this regard by evidence that Pavelin had also forged some checks while working at C & A in February, 1978, after the events that give rise to this cause of action took place, and that C & A did not immediately fire her upon learning of this. Such evidence logically has some bearing on the extent of dishonesty C & A was willing to tolerate in its employees. We believe the trial judge would be able to confine such evidence to its appropriate role and weight.

The appellants, relying on *Southern Pacific Co. v. Boyce*, 26 Ariz. 162, 223 P. 116 (1924) and *Western Coach Corp. v. Vaughn*, 9 Ariz.App. 336, 452 P.2d 117 (1969) say that punitive damages are not awardable against an employer unless the employee was acting within the course and scope of her employment. Neither of those cases really deal with a cause of action for negligent employment. The appellees cite *State v. Sanchez*, 119 Ariz. 64, 579 P.2d 568 (App.1978) as recognizing that one purpose of awarding punitive damages against an employer is to encourage the employer

to exercise close control over employees. That rationale is very close to the reason for recognizing a cause of action for negligent hiring. Some authorities recognize that judgments based on *respondeat superior* and on negligent hiring are not mutually exclusive and that punitive damages may, depending on the circumstances, be awarded under one theory and be inappropriate under the other. The most succinct statement of this is as follows:

> Moreover, even where liability exists under the doctrine of respondeat superior, the application of the *independent negligence* theory may permit an award of punitive damages since a master may be held liable for punitive damages when he is chargeable with gross neglect in the employment or retention in his service of an incompetent employee, knowing at the time of his unsuitability.

53 Am.Jur.2d *Master and Servant* § 422 at p. 438. (emphasis added).

The judgment of the trial court is reversed as to the award against C & A Realty for actual and punitive damages for the fraudulent acts of its salesperson based upon the theory of *respondeat superior*. The award for compensatory damages against C & A Realty for negligent hiring is affirmed. The award for punitive damages in the amount of $25,000 against C & A Realty for negligent hiring is affirmed. All remaining awards against all remaining defendants are affirmed.

GREER, J., concurs.

JACOBSON, Chief Judge, dissenting:

The majority opinion has attempted to fasten liability for Pavelin's fraudulent acts upon her employer, C & A Realty Co., (C & A) under a theory of "negligent hiring." While the law recognizes that an employer may, under appropriate circumstances, be independently liable for criminal acts of its agent which fall outside the course and scope of the employment, the basis for imposing such liability is not met in this case. This liability is aptly set forth in *Restatement (Second) of Agency* § 213 (1958) which provides:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:[1]
>
> \* \* \* \* \* \*
>
> (b) in the employment of improper persons ... in work involving risk of harm to others.
>
> \* \* \* \* \* \*

As comment a to this section points out:

> The rule stated in this Section is not based upon any rule of the law of principal and agent or of master and servant. It is a special application of the general rules stated in the Restatement of Torts.... Liability exists only if all the requirements of an action of tort for negligence exist.

Thus, there must be a duty, a breach of that duty and an injury which is the proximate cause of the breach. Taking the facts of this case, if we assume that C & A had a duty to employ only trustworthy real estate agents and that C & A negligently breached that duty by hiring Pavelin when it knew or should have known that she was a dishonest individual, the question still remains whether the breach of that duty was the proximate cause of the plaintiff's loss. Something in the employment must be the proximate cause of the loss. *Linden v. City Car Co.*, 239 Wis. 236, 300 N.W. 925 (1941).

This requirement of "proximate cause" is echoed in the companion section of *Restatement (Second) of Torts* § 307 (1965):

> It is negligence to *use* an instrumentality, whether a human being or a thing, which the actor knows or should know to be so incompetent, inappropriate, or defective, that its *use* involves an unreasonable risk of harm to others. (Emphasis added.)

Since there must be some nexus between the "conducting of the activity" (*Restatement (Second) of Agency*), or the "use" of (*Restatement (Second) of Torts*), it is apparent that simply because a principal employs a known thief, he will not be liable

for all thefts committed by his agent, regardless of their connection with the employment.

With these observations in mind, I turn to the facts in this case. The majority has properly concluded that "[t]here is no substantial evidence from which the trial court could have reasonably concluded that Pavelin was doing anything but pursuing her own interests in an illegal manner." While this conclusion is addressed in the context of scope of employment, which may not be applicable when viewing the employer's own negligence, it is pertinent as a starting point in analyzing whether Pavelin's employment was a proximate cause of plaintiffs' loss.

From this starting point, the only possible connection between Pavelin's employment and the plaintiff's loss was that solely because she was a real estate agent, she was either entrusted by plaintiffs or authorized by plaintiffs to obtain the necessary signatures upon the pertinent documents. On this evidentiary issue, the only person who gave documents to or received documents from Pavelin, was Pruitt's attorney, Esch.

It is important to note that there is no evidence that Esch knew or was familiar with Pavelin's broker, C & A Realty, or that he in any manner relied upon C & A's reputation in any dealing with Pavelin. We are then left only with a status conferred upon Pavelin of being a real estate person as the result of the assumed negligent[1] assistance of C & A.

The majority has correctly set forth the evidence as to the role this status played in this transaction:

> Esch would not categorically say that he would not have turned over documentation to Pavelin to procure signatures if he had known she was not a licensed salesperson.

The majority notes that Pavelin's status as a real estate salesperson may have played some subjective role in Esch's and Pruitt's dealings with Pavelin. However, here we are dealing with proximate cause—was Pruitt injured because C & A employed Pavelin? In absence of any evidence that "but for" Pavelin's status as a real estate agent, Pruitt would not have suffered a loss, I am compelled to the conclusion that Esch's and Pruitt's subjective motives are too attenuated to impose liability upon Pavelin's employer for "conducting an activity" through Pavelin, or "using" Pavelin in carrying out C & A's business of selling real estate.

I would therefore reverse any judgment against C & A.

---

**1.** The only possible negligence I can perceive from the record is that C & A vouched for Pavelin before the State Real Estate Department, the agency which had the ultimate responsibility for issuing the real estate license, and which had more information adverse to Pavelin than that possessed by C & A.