Debra S. RETHERFORD, Plaintiff
and Appellant,

v.

AT & T COMMUNICATIONS OF the
MOUNTAIN STATES, INC.; Cathy
Bateson; Louise Johnson; Vickie
Randall; and Doe I through Doe X,
Defendants and Appellees.

No. 890464.

Supreme Court of Utah.

Dec. 9, 1992.

Richard W. Perkins, Salt Lake City, for plaintiff and appellant.

Richard M. Hymas, Salt Lake City, for defendants and appellees.

ZIMMERMAN, Justice:

This case is before us on appeal from a grant of summary judgment dismissing plaintiff's complaint. Debra S. Retherford sued her former employer, AT & T Commu-nications, under several theories for harms arising from alleged sexual harassment by her co-employees. Specifically, she alleged that AT & T fired her in retaliation for complaining of being sexually harassed by her AT & T co-workers. She argued that such a discharge violated Utah public poli-cy barring reprisals for reports of sexual harassment. She also contended that the discharge breached a term of her implied contract with AT & T, which prohibited reprisal for reports of sexual harassment and was entirely separate from the agree-ment between her union's collective bar-gaining unit and AT & T. Retherford fur-ther asserted that AT & T was liable for negligently employing her harassers. Fi-nally, Retherford sued former co-workers Cathy Bateson (aka Cathy Bateson–Hough), Louise Johnson, and Vickie Randall, claiming that their retaliatory con-duct constituted intentional infliction of emotional distress and malicious interfer-ence with her contractual relations with AT & T.

Defendants moved to dismiss the com-plaint, claiming, *inter alia*, that workers covered by employment contracts that pro-hibit discharge other than for just cause should not be able to maintain a tort action for discharge in violation of public policy; that the Utah Anti–Discriminatory Act ("UADA") preempted Retherford's com-mon law causes of action, *see* Utah Code Ann. §§ 34–35–1 to –8 (1988) (amended 1989, 1990 & 1991); that federal labor law preempted Retherford's common law causes of action, *see* 29 U.S.C. § 185(a); and that Retherford had failed to state tort claims against her former co-workers or to bring those claims within the period fixed by the relevant statute of limitations.

The district judge considered affidavits in support of and in opposition to the mo-tion to dismiss and granted defendants summary judgment on all claims. Rether-ford appeals.

To summarize our ruling today, we hold as follows: first, that both employees cov-ered by employment contracts that limit the bases for discharge and employees who are at-will can maintain a tort action for

discharge in violation of Utah public policy; second, that the UADA provides the exclusive remedy for Retherford's claim for discharge in violation of public policy but does not bar her other causes of action; third, that federal labor law preempts Retherford's claims for breach of implied contract and malicious interference with contractual relations and partially preempts Retherford's claim for intentional infliction of emotional distress; and fourth, that Retherford brought her claims for emotional distress and negligent employment in a timely manner and has stated a cause of action for intentional infliction of emotional distress against her former co-workers. We therefore reverse the order granting summary judgment and remand this case for further proceedings on Retherford's claim of negligent employment and the nonpreempted portion of her claim for intentional infliction of emotional distress.

In reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in a light most favorable to the nonmoving party. *Smith v. Batchelor*, 832 P.2d 467, 468 (Utah 1992); *Rollins v. Petersen*, 813 P.2d 1156, 1158 (Utah 1991); *Utah State Coalition of Senior Citizens v. Utah Power & Light Co.*, 776 P.2d 632, 634 (Utah 1989). We state the facts of the instant case—which we draw primarily from Retherford's affidavit submitted in opposition to AT & T's motion to dismiss—accordingly. *See Sandy City v. Salt Lake County*, 827 P.2d 212, 215 (Utah 1992).

In 1976, Mountain States Telephone and Telegraph Company hired Retherford to work as a telephone operator in Grand Junction, Colorado. In 1983, due to the nationwide restructuring of AT & T and its subsidiary companies, Retherford was transferred to AT & T's Wasatch office, located in Salt Lake City, where she continued working as a telephone operator.

Retherford alleges that two separate agreements governed her employment with AT & T. As an AT & T employee, Retherford was covered by a collective bargaining agreement between AT & T and her union, the Communications Workers of America ("CWA"). Independent of the collective bargaining agreement, AT & T also had promulgated a code of conduct that outlined employees' rights and responsibilities and was specifically brought to the attention of and acknowledged in writing by all employees. Retherford argues that the code of conduct created an implied employment contract between AT & T and its employees.

Both the collective bargaining agreement and the code of conduct prohibited sexual harassment and outlined procedures for aggrieved employees to press any complaints. The collective bargaining agreement stated, "[N]either the Company nor the Union shall unlawfully discriminate against any employee because of such employee's race, color, religion, sex, age or national origin or because he or she is handicapped, a disabled veteran or a veteran of the Vietnam era." The collective bargaining agreement required resort to arbitration to resolve "[g]rievances arising out of or resulting from the application or interpretation of the provisions of this Agreement" and "[g]rievances arising out of or resulting from the dismissal, suspension, or demotion of a regular employee...."

The code of conduct's provision on sexual harassment was more detailed than that in the collective bargaining agreement. The code of conduct read in relevant part:

Any sexually harassing conduct in the workplace, whether physical or verbal, committed by any employee is also prohibited. This includes: repeated offensive sexual flirtations, advances, propositions; continued or repeated verbal abuse of a sexual nature; graphic verbal commentaries about an individual's body; sexually degrading words used to describe an individual; and the display in the workplace of sexually suggestive objects, pictures or posters.

Employees who have complaints of sexual harassment should report such conduct to their supervisors. If this is not appropriate, employees are urged to seek the assistance of their EEO coordinator. Where the investigation confirms

the allegations, prompt corrective action should be taken.

. . . .

Any reprisal against an employee because the employee, in good faith, reported a violation or suspected violation is strictly forbidden.

Soon after Rutherford transferred to Salt Lake City, manager Fayonne Johanneson required Retherford meet with her to discuss the provisions of the conduct code and to sign a statement saying that she had read and understood them. This procedure was repeated every year during Retherford's tenure at the Wasatch office. In an affidavit submitted in opposition to defendants' motion to dismiss, Retherford termed this annual procedure "a condition of her continued employment" with AT & T.

Among Retherford's co-workers at the Wasatch office were Cathy Bateson–Hough, an AT & T manager, Louise Johnson, a supervisor, Vickie Randall, a fellow employee and union steward, and Jolene Gailey,[1] a fellow telephone operator. Upon her arrival in Salt Lake City, she noticed the sexually uninhibited atmosphere of the Wasatch office. In her affidavit, Retherford testified that during her first day at work, Bateson–Hough showed her an obscene Valentine's Day card. Soon Retherford became aware that obscene jokes and foul language were commonplace among her co-workers.

After approximately six months, Retherford switched to the night shift. At this time, she encountered a more sexually suggestive work environment, one she found threatening. As before, she noted that sex was a common topic of discussion. For example, in her affidavit she described Johnson's loud accounts of an alleged sexual relationship with another AT & T employee.

For the first time, however, Retherford found herself a target of the sexually suggestive commentary. Specifically, she alleges that Jolene Gailey subjected her to unwelcome sexual advances. Retherford's affidavit describes these advances as follows:

Retherford complains that Gailey touched her, made numerous comments regarding her appearance, and regularly suggested that Retherford join her "in various activities." Gailey's friends, including defendant Johnson, also began to congregate around Retherford, conversing frequently and explicitly about subjects of a sexual nature. As time passed, Gailey became more aggressive. When "visibly intoxicated," Gailey sat next to Retherford, touched her affectionately on the arm, and said, "I'm going to save you from Dave Todd," a male AT & T employee with whom Retherford had been sitting at meals. Gailey subsequently asked Retherford to pose nude while Gailey painted or sculpted her likeness, told Retherford that she was looking for a roommate, and informed Retherford that she hated men and even the sound of men's voices on the telephone. Retherford also believes that Gailey passed a note around the office stating that Retherford was having an affair with a male AT & T employee.

After approximately ten months of such treatment, Gailey telephoned Retherford at home and asked her if she intended to file an EEOC complaint about Gailey's conduct.[2] Retherford testified in her affidavit that she replied that she would file a complaint if Gailey continued to bother her. According to Retherford's affidavit, Gailey responded, "I'm sorry if I offended you, but I feel I shouldn't have to apologize for my sexuality."

Retherford testified in her affidavit that after she informed Gailey that she was considering filing a complaint of sexual harassment, Gailey and other AT & T employees began to retaliate by staring at her, making "threatening facial expressions" at her, walking extremely close to

---

1. Retherford originally named Gailey as a defendant in this suit, but dismissed her when Gailey declared bankruptcy.

2. The EEOC, or Equal Employment Opportunity Commission, is a federal agency charged with administering complaints under Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e–5(b).

her, and following her around the office. During March of 1984, Retherford twice complained to her supervisor and manager of the retaliatory harassment from Gailey and other co-workers. Two months later, she wrote manager Bateson–Hough a letter complaining that Gailey continued to harass her despite her requests that Gailey leave her alone. The next day, May 10, 1984, Retherford submitted a written complaint to AT & T's Equal Employment Opportunity ("EEO") coordinator.

About five days later, Richard Salazar, an AT & T employee and a CWA union steward, called Retherford at home to discuss the complaint she had submitted. Retherford testified that Salazar told her, "You're the new kid on the block—you're not going to win this. We don't know you very well, but we do know Jolene [Gailey], she is a respectable person in the community and an artist." He added, "Somebody could get fired over this." Darlene Anderson, a first-level manager of the Wasatch office, also cautioned Retherford, saying, "Just be careful what you say and do; this is a strong and big group that you are dealing with." Several weeks after Retherford complained to the AT & T EEO coordinator, she was attempting to cross the street at 1:15 a.m. when Gailey sped past her. When Retherford reached her own car and drove away, Gailey followed her for a few miles.

During June of 1984, Linda Johnston, an AT & T employee who Retherford says is a personal friend of Bateson–Hough's, investigated Retherford's complaint. Retherford said that Johnston's investigation consisted solely of personal interviews with and submission of written statements by Retherford and Gailey. About one month later, Johnston submitted the EEO coordinator's report, which recommended that Retherford and Gailey have as little contact with each other as possible. Subsequently, Retherford received a telephone call from Reta Pehrson, an AT & T supervisor and CWA vice president, who told her, "You have to be satisfied with the [EEO coordinator's] decision. . . . If anybody asks you about it, don't tell them and don't say anything." Pehrson added, "Cathy [Bateson–

Hough] wanted me to also tell you that if you would like a transfer, she will transfer you to the Sundance Office."

Retherford stated in her affidavit that the harassment in the Wasatch office did not abate following the issuance of the EEO coordinator's report and recommendations. At one point, Retherford overheard an AT & T employee say to a group of co-workers, including defendant Johnson, "Debi [Retherford] would make a good stripper—she has big boobs." Looking directly at Retherford, Johnson replied, "My bra size is 34B." Retherford said that Gailey and other co-workers continued to stare at her, walk close to her, follow her, and make faces at her. She also said that on at least one occasion, Gailey and Johnson accused Retherford of staring at them.

In late August of 1984, Retherford filed a charge letter with the EEOC, alleging that some of her co-workers had sexually harassed her for a year and that AT & T had done nothing to remedy the situation. Several months later, Alfred Aros, an EEOC investigator, called Retherford at home to tell her that of the four witnesses he had interviewed while investigating her complaint, three had told him there was a "lesbian problem" at the Wasatch office. He said he intended to issue a warning to AT & T management about this situation. Around the same time, the AT & T EEO coordinator surveyed the workers in the Wasatch office about sexual harassment and eventually issued a report concluding that employees at the Wasatch office engaged in a great deal of sexually oriented discussion, including many obscene jokes. This report failed to curb the sexual atmosphere in the Wasatch office. Indeed, Retherford testified in her affidavit that after its issuance, the obscene jokes and explicit sexual conversations increased in frequency and offensiveness.

In late December of 1984, Retherford again delivered a written complaint to Bateson–Hough. Retherford says that Bateson–Hough summoned her and told her that the AT & T EEO coordinator had issued a letter chastising both Retherford and Gailey for their continued quarreling.

She refused to show Retherford the letter. Bateson–Hough also informed Retherford that Retherford was on warning of dismissal and told her that AT & T would fire her if she continued to complain about Gailey.

Retherford testified in her affidavit that the abuse by her co-workers continued, exacerbated by the perception that she was an informant. In Retherford's presence, Johnson and others made various comments lamenting the fact that someone was watching them and would report them if they broke company rules. Following one such comment, Johnson looked at Retherford and said, "Isn't that right, Debi?" Retherford also said that Bateson–Hough made no effort to protect her from this retaliation. In fact, she said, Bateson–Hough rearranged the seating in the Wasatch office, placing Retherford next to some of her harassers and assigning her to "slow" work stations, which hampered her productivity.

To cope with the stress of her work place, Retherford began visiting a psychiatrist and a physician in the summer of 1985. In September of 1985, Retherford says, she took medical disability leave to recover from the stress and anxiety caused by the harassment. Following her psychiatrist's instructions that she must not work in proximity to "the people who started the panic in her," she never returned to the Wasatch office.

Retherford testified in her affidavit that on or about March 12, 1986, Douglas Erickson, group manager of the Wasatch office, and Vickie Randall, an AT & T employee and union steward, called Retherford to tell her that because she was medically incapable of returning to the Wasatch office, AT & T was transferring her to its office in Boise, Idaho. Erickson ordered her to report to her new assignment within ten days. When Retherford protested that her family obligations and medical treatment in Salt Lake City prevented her from moving to Boise on such short notice, Randall responded, "What do you expect us to do, build you a new building?" Erickson then advised Retherford that if she failed to report to the Boise office within ten days, AT & T would fire her.

Retherford did not report to Boise by the deadline, and AT & T fired her on March 26, 1986. She filed a written grievance with the CWA, Local 7704, on April 9th. On September 29th, the vice president of Local 7704 told Retherford that due to an oversight on the part of the CWA, the union had not submitted her grievance for arbitration and that the time for processing her grievance, as established by the bargaining agreement, had expired.

On July 21, 1988, two years and four months after she was fired, Retherford filed suit in United States District Court for the District of Utah, alleging federal claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, –3, and section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and pendent state UADA and common law claims. On March 21, 1989, the court dismissed the federal claims with prejudice as being untimely and dismissed the state claims without prejudice for lack of pendent jurisdiction. *Retherford v. AT & T*, No. C–88–648W, slip op. (D.Utah Mar. 16, 1989) (unpublished).

On April 7, 1989, Retherford filed suit in the Third Judicial District Court, alleging the following: first, that AT & T fired her in violation of Utah public policy, which bars reprisals for reporting sexual harassment; second, that AT & T's discharging her in retaliation for complaining of sexual harassment violated a term of an employment contract implied from AT & T's code of conduct; third, that AT & T was liable for negligently employing Retherford's sexual harassers; fourth, that Bateson–Hough, Johnson, and Randall intentionally inflicted emotional distress on Retherford; and fifth, that Bateson–Hough, Johnson, and Randall maliciously interfered with Retherford's contractual relations.

Defendants moved to dismiss, arguing first, that Utah does not recognize a common law cause of action for discharge in violation of public policy; second, that even if Utah did recognize such a cause of action, federal and state anti-discrimination

laws would preempt any such claim; third, that as a matter of federal labor law, the AT & T–CWA collective bargaining agreement barred Retherford's state claims; fourth, that Retherford had failed to timely assert her state law claims for negligent employment, breach of implied contract, and intentional infliction of emotional distress; and fifth, that Retherford had failed to state a claim of intentional infliction of emotional distress because the conduct she alleged did not "offend against the generally accepted standards of indecency and immorality," as required by Utah case law.[3]

■ Relying on affidavits in reaching its decision, the trial court treated defendants' motion to dismiss as a motion for summary judgment. *See* Utah R.Civ.P. 12(c), 56(c). The court entered judgment in favor of AT & T, Bateson–Hough, Johnson, and Randall, offering the following explanation for the ruling:

> [T]he Court having found that there are no genuine issues of material fact; and the Court having further determined that Defendants are entitled to judgment as a matter of law ... [,] Defendants' Motion to Dismiss, which is being treated as a motion for summary judgment, is hereby granted.[4]

Retherford appeals.

■ Before addressing the merits, we note the applicable standard of review. Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *Sandy City*, 827 P.2d at 217–18; *Rollins*, 813 P.2d at 1159; *Landes v. Capital City Bank*, 795 P.2d 1127, 1129 (Utah 1990). Because a summary judgment resolves only questions of law, we give no deference to the trial court's determinations. We affirm only if the decision before us was correct. *Sandy City*, 827 P.2d at 218; *Rollins*, 813 P.2d at 1159; *Landes*, 795 P.2d at 1129.

The present appeal requires that we examine the interplay between statutory causes of action and common law tort and contract causes of action for discharge in retaliation for complaining of sexual harassment. We first address the common law. In the last decade, state courts have shown a growing willingness to increase employer exposure to suit for claims relating to the discharge of employees, a trend that has taken a number of different forms. James N. Dertouzos & Lynn A. Karoly, *Labor–Market Responses to Employer Liability* viii (The RAND Institute for Civil Justice 1992). In Utah, this court has joined the national trend by converting into a rebuttable presumption the common law rule that absent an express agreement, employment was at-will, *see Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1044 (Utah 1989) (Durham, J., joined by Stewart, J.); *id.* at 1051–52 (Zimmerman, J., concurring in the result), by recognizing implied employment contracts, *see id.* at 1044–46, 1049 (Durham, J., joined by Stewart, J.); *id.* at 1052–53 (Zimmerman, J., concurring in the result), and by adopting the tort of discharge in violation of public policy, *see Peterson v. Browning*, 832 P.2d 1280, 1282 (Utah 1992) (Durham, J., joined by Stewart, J.); *id.* at 1285 (Howe, A.C.J., concurring). *See generally* Janet Hugie Smith & Lisa A. Yerkovich, *Utah Employment Law Since Berube*, Utah Bar J., Oct. 1992, at 15.

---

**3.** AT & T also argued that Bateson–Hough could not be liable for interference with contractual relations between Retherford and AT & T because she was an agent of one of the contracting parties and that Retherford's pleadings failed to state a claim that Johnson and Randall had interfered with contractual relations. Because of the result we reach in this case, we have no cause to address these issues.

**4.** Such a blanket statement provides us with no guidance as to the trial court's reasoning. It therefore does not comply with rule 52(a) of the Utah Rules of Civil Procedure, which requires trial judges to issue brief written statements of their grounds for granting summary judgment when multiple grounds are presented. *See* Utah R.Civ.P. 52(a). Although failure to issue a statement of grounds is not reversible error absent unusual circumstances, we take this opportunity to remind trial judges that the presumption of correctness ordinarily afforded trial court rulings "has little operative effect when members of this court cannot divine the trial court's reasoning because of the cryptic nature of its ruling." *Allen v. Prudential Property & Casualty Ins. Co.*, 839 P.2d 798, 800 (Utah 1992).

In making these changes to Utah's common law, we did not address the extent to which the availability of preexisting statutory and contractual remedies for employers' malfeasance against employees would affect the availability of these new common law contract and tort causes of action. Retherford puts this question squarely before us. She asserts only common law tort and contract claims, apparently because the statute of limitations has run on any claims for relief she might have had under federal and state antidiscrimination statutes, *see* 42 U.S.C. § 2000e–5(e); Utah Code Ann. § 34–35–7.1; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973), and federal labor law, *see DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 171–72, 103 S.Ct. 2281, 2294, 76 L.Ed.2d 476 (1983).

Her appeal presents the following novel questions: First, when an employee has a contractual right to be fired only for just cause and therefore has a breach of contract claim if he or she can demonstrate discharge on some other ground, such as retaliation for exercising a legal right, should we allow a common law tort action for discharge in violation of public policy that is based on the same facts that underlie the claim for breach of contract? Second, does the Utah Anti–Discriminatory Act's exclusive remedy provision preempt common law causes of action based on the same facts necessary to prove a cause of action under the statute, including common law causes of action for discharge in violation of public policy, breach of implied contract, negligent employment, intentional infliction of emotional distress, or malicious interference with contract? Third, does federal labor law preempt these same claims? Fourth, if neither state nor federal statute preempts her claims against her co-workers, is Retherford's assertion of these claims timely? Fifth, if neither state nor federal statute preempts Retherford's claim for intentional infliction of emotional distress, is the conduct Retherford alleges sufficiently severe to satisfy the standard we have set for this tort? We will discuss each issue in turn.

■ We begin with defendants' contention that we should not allow an employee with an employment contract that protects him or her from discharge without just cause—a contract that would prohibit discharge in violation of public policy—to maintain a common law tort action for discharge in violation of public policy. Defendants argue that because the facts Retherford alleges constitute a cause of action for breach of her collective bargaining agreement's just-cause provision, she is precluded from seeking tort damages for the same conduct.

The AT & T–CWA collective bargaining agreement provides the premise for defendants' argument. It requires arbitration for "[g]rievances arising out of or resulting from the dismissal ... of a regular employee," and it states that a dismissal "shall stand unless it is established that the dismissal ... was effected without *just cause.*" (Emphasis added.) Defendants contend that the concept of "just cause" should exclude all reasons for discharge that are inconsistent with public policy. They argue that because the contractual provision protecting an employee from all but a just-cause dismissal protects the same interests as a tort cause of action for discharge in violation of public policy, no purpose is served by permitting a discharged employee to proceed on the tort claim when he or she has a contractual cause of action. Defendants contend that the contractual provision adequately vindicates the public policy underlying the tort claim.

We disagree. Our recent decision in *Peterson*, which adopted a tort action for discharges in violation of public policy and was decided after the briefing and argument of the present case, requires rejection of defendants' argument. As adopted in *Peterson*, the tort of discharge in violation of public policy differs in both scope and sanction from any contractual provision that might limit an employer's power to discharge an employee for other than just cause. *See Peterson* 832 P.2d at 1282–83, 1285 (Durham, J., joined by Stewart, J.); *id.* at 1285–86 (Howe, A.C.J., concurring). Both respect for precedent and sound pub-

lic policy compel the conclusion that the tort of discharge in violation of public policy should be available to all employees, regardless of their contractual status.

Our reasoning is as follows: First, the logic of *Peterson* and of the earlier *Berube* decision indicates that the cause of action for discharge in violation of public policy limits the power of *all* employers to discharge employees, without regard to whether the employee is at-will or protected by an express or implied employment contract. *See id.* at 1287 n. 2 (Zimmerman, J., concurring and dissenting, joined by Hall, C.J.); *Berube,* 771 P.2d at 1043 n. 10 (Utah 1989) (opinion of Durham, J., joined by Stewart, J.); *id.* at 1051 (Zimmerman, J., concurring in the result). A primary purpose behind giving employees a right to sue for discharges in violation of public policy is to protect the vital state interests embodied in such policies. We cannot fulfill such a purpose if we hinge this cause of action on employees' contractual status and thus limit its availability to any one class of employees. *See Peterson,* 832 P.2d at 1287 n. 2 (Zimmerman, J., concurring and dissenting); *see also Petermann v. International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local 396,* 174 Cal.App.2d 184, 344 P.2d 25, 27 (1959).

■ Second, not every discharge in violation of a contractual just-cause provision rises to the level of a violation of public policy. As Justice Durham pointed out in *Peterson,* only those public policies that are "clear" and "substantial" and arise from statutes or constitutions qualify for vindication through the tort of discharge in violation of public policy. 832 P.2d at 1282. Consequently, the overlap of a contractual just-cause cause of action and a public policy tort cause of action is not as great as defendants would have us believe.

■ Finally, the vindication of public policy worked by the tort cause of action cannot be accomplished by a contractual provision that prohibits discharges for any but just cause. Even when a contract prohibits conduct that also would violate public policy, the remedies for breach of that contract would satisfy only the private interests of the parties to the agreement, i.e., by restoring a wrongfully discharged employee to his or her position and making him or her whole. There is no reason to expect that these remedies would be as draconian as those that might be available under the tort cause of action, remedies that are designed not only to remedy the breach and make the employee whole, but to deter and punish violations of vital state interests. While any employer violating a contractual just-cause standard of dismissal should be liable for breaking its promise to its employee, *Peterson* dictates that an employer who violates clear and substantial public policies should be liable for the more expansive penalties of tort, a potentially harsher liability commensurate with the greater wrong against society. When an employer's act violates both its own contractual just-cause standard and a clear and substantial public policy, we see no reason to dilute the force of the double sanction. In such an instance, the employer is liable for two breaches, one in contract and one in tort. It therefore must bear the consequences of both.

For the foregoing reasons, we reject defendants' argument. We hold that the tort of discharge in violation of public policy is a limitation on all discharges, not merely an exception to the at-will doctrine. *See Peterson,* 832 P.2d at 1287 n. 2 (Zimmerman, J., concurring and dissenting, joined by Hall, C.J.); *Berube,* 771 P.2d at 1043 n. 10 (opinion of Durham, J., joined by Stewart, J.); *id.* at 1051 (Zimmerman, J., concurring in the result); *see also Midgett v. Sackett–Chicago, Inc.,* 105 Ill.2d 143, 85 Ill.Dec. 475, 478–79, 473 N.E.2d 1280, 1283–84 (1984), *cert. denied,* 474 U.S. 909, 106 S.Ct. 278, 88 L.Ed.2d 243 (1985); *Ewing v. Koppers Co.,* 312 Md. 45, 537 A.2d 1173, 1175 (1988); *Lepore v. National Tool & Mfg. Co.,* 224 N.J.Super. 463, 540 A.2d 1296, 1301 (1988), *aff'd,* 115 N.J. 226, 557 A.2d 1371, *cert. denied,* 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 353 (1989); *cf. Johnson v. Transworld Airlines, Inc.,* 149 Cal. App.3d 518, 196 Cal.Rptr. 896, 899 (1983);

*K Mart Corp. v. Ponsock,* 103 Nev. 39, 732 P.2d 1364, 1369–70 (1987).

We next turn to the UADA to determine whether it preempts Retherford's common law claims for discharge in violation of public policy, breach of implied contract, malicious interference with contract, negligent employment, and intentional infliction of emotional distress. Retherford argues that the UADA has no preemptive effect because she hopes to avoid its provisions and pursue her common law remedies.

■ Our analysis of this question breaks down into two subsidiary issues. First, does the UADA preempt common law causes of action for retaliation against an employee for complaints of sexual harassment? Second, if the UADA does have this preemptive effect, do the causes of action Retherford alleges fall within the UADA's preemptive scope? We discuss these questions in turn.

The starting place for a determination of the preemptive effect of the UADA is the statute itself. The legislature enacted the UADA in 1969 as part of a comprehensive state labor law scheme. *See* 1969 Utah Laws ch. 85, §§ 160–67. As passed, the statute neither prohibited employer retaliation against employees complaining of discrimination nor provided that the UADA supplied the exclusive remedy for discriminatory or prohibited employment practices. In 1985, the legislature added both a provision barring employer retaliation against employees opposing any employment practices prohibited by the chapter, 1985 Utah Laws ch. 189, § 3, and a provision making the UADA's remedies exclusive, *id.* § 4. The 1985 exclusivity provision read as follows:

> The procedures contained in this section and Section 34–35–8 are the exclusive remedy under state law for employment discrimination because of race, color, sex, age, religion, national origin, or handicap.

Utah Code Ann. § 34–35–7.1(11) (1988) (amended 1990 & 1991) (current version at § 34–35–7.1(15)).[5] The 1985 exclusivity provision, while listing specific grounds that had been theretofore prohibited, did not mention expressly the newly added prohibited action: employer retaliation against employees who opposed prohibited employment practices. *See* 1985 Utah Laws ch. 189, § 4. In 1990, the legislature added retaliation to the listed grounds covered by the exclusivity provision. *See* 1990 Utah Laws ch. 63, § 2.

In arguing that the UADA is not the exclusive remedy for employer retaliation against employees who oppose prohibited discrimination, Retherford seizes upon the fact that the exclusivity provision in effect in 1986, when she was fired, did not expressly mention retaliation. She claims that this omission excepts her common law claims from the UADA's exclusivity provision. We disagree. We find that taken as a whole, the plain text of the statute then in effect preempts common law causes of action for retaliation for complaints of employment discrimination. Furthermore, the circumstances surrounding the 1990 amendment of the statute bolster this construction. We discuss our construction of the statute below.

■ As Retherford correctly notes, the word "retaliation" does not appear in the exclusivity provision in effect at the time she was fired. She also correctly notes that where statutory language is plain and unambiguous, this court will not look beyond it to divine legislative intent. *See Schurtz v. BMW of North Am., Inc.,* 814 P.2d 1108, 1112 (Utah 1991); *Allisen v. American Legion Post No. 134,* 763 P.2d 806, 809 (Utah 1988). However, she neglects to mention that we interpret a statute as a whole, not piecemeal. *See Schurtz,* 814 P.2d at 1112; *Clover v. Snowbird Ski Resort,* 808 P.2d 1037, 1045 (Utah 1991); *Hansen v. Salt Lake County,* 794 P.2d 838, 841 (Utah 1990); *Madsen v. Borthick,* 769 P.2d 245, 252 n. 11 (Utah

---

**5.** The exclusivity provision now reads, "The procedures contained in this section are the exclusive remedy under state law for employment discrimination based upon race, color, sex, retaliation, pregnancy, childbirth, or pregnancy-related conditions, age, relation, national origin, or handicap." Utah Code Ann. § 34–35–7.1(15) (Supp.1992).

1988); *Peay v. Board of Ed. of Provo City School Dist.,* 14 Utah 2d 63, 66, 377 P.2d 490, 492 (1962). Consequently, we begin by examining the statute as a whole.

Although the exclusivity provision itself specifies only "discrimination," the statute as a whole defines retaliation as "discrimination," thereby implicitly including retaliation within the exclusivity provision. Section 34–35–6(1)(a)(i) defines retaliation as a "discriminatory or prohibited" employment practice. Utah Code Ann. § 34–35–6(1)(a)(i). One could argue that interpreting this provision as defining retaliation as discrimination would slight the importance of the words "or prohibited" in section 34–35–6(1)(a)(i). However, this argument fails in light of the fact that another section of the statute defines "prohibited" employment practices as nothing more than those "specified as discriminatory, and therefore unlawful, in Section 34–35–6." *Id.* § 34–35–2(7). Because sections 34–35–6(1)(a)(i) and 34–35–2(7) together define retaliation as nothing more than a form of prohibited employment discrimination, retaliation must fall within the section 34–35–7.1(11) direction that the UADA's procedures "are the exclusive remedy under state law for employment discrimination." *Id.* § 34–35–7.1(11) (1988) (amended 1990 & 1991) (current version at § 34–35–7.1(15)). Therefore, as a matter of statutory construction, we find that the version of the UADA in effect at the time of Retherford's firing was the exclusive remedy for employer retaliation against an employee who complained of sexual harassment. We hold that the UADA preempts common law causes of action for discharge in retaliation for complaints of employment discrimination. *See Sauers v. Salt Lake County,* 735 F.Supp. 381, 386 (D.Utah 1990); *cf. Wolk v. Saks Fifth Ave., Inc.,* 728 F.2d 221, 223–24 (3d Cir.1984); *Strauss v. A.L. Randall Co.,* 144 Cal.App.3d 514, 194 Cal.Rptr. 520, 523 (1983).

■ As a final matter, we recognize that the legislature's later amendment of the exclusivity provision to prohibit retaliation explicitly might indicate that the earlier exclusivity provision had not included retaliation within its scope. However, Retherford has produced no evidence that the legislature intended this amendment to change the substantive law rather than merely to clarify it. Our own research into the history of this amendment has been similarly unavailing. Absent some evidence to the contrary, we conclude that taken as a whole, the version of the UADA in effect at the time of Retherford's firing defined retaliation as discrimination and provided the exclusive remedy for this type of discrimination. In reaching this conclusion, we are mindful of our statutory mandate to construe liberally statutes in derogation of the common law. *See* Utah Code Ann. § 68–3–2.

■ Having determined that the UADA is the exclusive remedy for a claim of employer retaliation for complaints of employment discrimination, we turn to the question of whether Retherford's tort and contract claims come within the scope of the UADA's preemptive effect. This question presents us with an apparently novel question in Utah: What analytical model should determine when an exclusive statutory cause of action preempts a common law claim based on the same facts? Although the Code provides that courts are to construe liberally statutes that are in derogation of the common law, *see id.* § 68–3–2, and although we have considered that statute when examining the scope of statutorily created causes of action or duties, *see, e.g., Asay v. Watkins,* 751 P.2d 1135, 1136–37 (Utah 1988); *AAA Fencing Co. v. Raintree Dev. & Energy Co.,* 714 P.2d 289, 290–91 (Utah 1986) (per curiam); *Niblock v. Salt Lake County,* 100 Utah 573, 581–82, 111 P.2d 800, 804 (1941), we have yet to propound a generic test for determining when a statutory cause of action functions as the exclusive remedy for the wrong, thereby foreclosing enforcement of either a preexisting common law remedy or a common law remedy recognized after the enactment of the statute.

Because we lack an analytical model to answer this question, we have looked to law outside our jurisdiction. Our research has revealed a diversity of approaches.

Courts have described at least three separate tests for determining the preemptive effect of statutes on the common law. First, in examining the very issue that confronts us now, the United States District Court for the District of Utah decided that the relevant inquiry was whether the common law cause of action was "based upon the very conduct which is necessary to prove sexual harassment or sex discrimination under the [UADA], namely, conduct expressly prohibited by the Act...." *Davis v. Utah Power & Light Co.*, No. 87–C–0659G, slip op. at 12, 1988 WL 217350 (D.Utah Nov. 23, 1988) (unpublished).

Second, in similar contexts, other courts have articulated a test grounded on what can be termed "antecedent existence." These courts hold that the statutory action is the exclusive remedy if the common law cause of action did not exist before the statutory cause of action was created. *See Bernstein v. Aetna Life & Casualty*, 843 F.2d 359, 365 (9th Cir.1988); *Froyd v. Cook*, 681 F.Supp. 669, 674 (E.D.Cal.1988); *Guevara v. K–Mart Corp.*, 629 F.Supp. 1189, 1191 (S.D.W.Va.1986); *Mahoney v. Crocker Nat'l Bank*, 571 F.Supp. 287, 293 (N.D.Cal.1983); *Register v. Coleman*, 130 Ariz. 9, 633 P.2d 418, 423 (1981); *Valley Drive–In Theatre Corp. v. Superior Court*, 79 Ariz. 396, 291 P.2d 213, 215 (1955); *cf. Lui v. Intercontinental Hotels Corp.*, 634 F.Supp. 684, 688 (D.Haw.1986).

Finally, in determining the preemptive scope of workers' compensation statutes, courts have established a test that inquires whether the statutory scheme supplies an indispensable element of the tort claim. *See Foley v. Polaroid Corp.*, 381 Mass. 545, 413 N.E.2d 711, 716 (1980); *Gambrell v. Kansas City Chiefs Football Club, Inc.*, 562 S.W.2d 163, 168 (Mo.Ct.App.1978). We have adopted this test in determining whether the Utah workers' compensation statute supplants common law causes of

action for injuries on the job. *See Mounteer v. Utah Power & Light Co.*, 823 P.2d 1055, 1058 (Utah 1991).

Because we see no reason why the indispensable element test should not apply to the area before us as well as to workers' compensation [6] and because the other two approaches appear to be cumbersome and indeterminate, we hold that the indispensable element test is the correct analytical model for determining whether a statutory cause of action forecloses a common law remedy. To explain this choice, we briefly outline our objections to the other two models courts have followed in this area.

We begin with the federal district court's test in *Davis*, under which the UADA would preempt only "those common law causes of action which are based upon the very conduct which is necessary to prove [a claim under the act]." Slip op. at 12. We think that this test is simply too ambiguous. First, the *Davis* court itself seems uncertain as to precisely how the test should be applied. In considering whether the UADA preempted several different claims, the court articulated the standard in varying and not wholly consistent ways. At one point, the court found that the UADA did not preempt a claim for intentional or negligent infliction of emotional distress "because the theoretical basis [sic] for the two claims are separate and distinct," *id.* at 21, while at another, the court found that the UADA did not preempt a claim for negligent supervision because it "may encompass more than acts defined to be 'discriminatory or prohibited employment practices' under the Utah Act," *id.* at 22. Second, we are unconvinced that inquiring whether a common law cause of action is broader than a statutory cause of action will result in defensible distinctions between those causes of action that are preempted and those that are not.[7] Conse-

---

**6.** In fact, we have employed a similar analysis in the area of governmental immunities. *See Gillman v. Department of Fin. Insts.*, 782 P.2d 506, 511–12 (Utah 1989).

**7.** The *Davis* court's analysis of a claim for intentional infliction of emotional distress caused by sexual harassment highlights this uncertainty.

The court found that the UADA did not preempt the claim because it went "beyond the discriminatory conduct prohibited by the Utah Act." *Davis*, slip op. at 17. Apparently, the court believed that the extra element of outrage made the tort broader than the statutory claim. However, it could just as well be argued that the extra element makes the tort *narrower* than the

quently, we decline to adopt the *Davis* test as the standard for determining preemption in this state.

Similarly flawed is the test of antecedent existence, which appears most developed in California. This test focuses on timing. The general rule is that if the common law cause of action did not exist before the statutory cause of action was created, the statutory cause of action preempts the common law. *See Bernstein*, 843 F.2d at 365; *Froyd*, 681 F.Supp. at 674; *Guevara*, 629 F.Supp. at 1191; *Mahoney*, 571 F.Supp. at 293; *Register*, 633 P.2d at 423; *Valley Drive–In Theatre Corp.*, 291 P.2d at 215; *Strauss*, 194 Cal.Rptr. at 522–23; *Gay Law Students Ass'n v. Pacific Tel. & Tel. Co.*, 24 Cal.3d 458, 156 Cal.Rptr. 14, 34, 595 P.2d 592, 612 (1979); *Palo Alto–Menlo Park Yellow Cab Co. v. Santa Clara County Transit Dist.*, 65 Cal.App.3d 121, 135 Cal.Rptr. 192, 197 (1976).

We reject the test of antecedent existence for two reasons. First, we are unsure of its scope. Despite the apparently general statement of the rule, we cannot tell whether, in fact, the rule applies to anything other than a common law claim for discharge in violation of public policy, which is the usual context in which the rule has been applied. *See, e.g., Bernstein*, 843 F.2d at 362–64; *Froyd*, 681 F.Supp. at 673 & n. 10; *Mahoney*, 571 F.Supp. at 292–93; *Strauss*, 194 Cal.Rptr. at 522. The few cases in which courts have addressed other common law causes of action, ostensibly under the antecedent existence test, are so cryptic as to appear conclusory. *See, e.g., Real v. Continental Group, Inc.*, 627 F.Supp. 434, 445 (N.D.Cal.1986); *Diem v. City & County of San Francisco*, 686 F.Supp. 806, 811–12 (N.D.Cal.1988). Although it is at least arguable that the rule should not apply to such common law claims as breach of contract, which generally predate state antidiscrimination stat-

utes, we have found no reasoned analysis of this question.

This uncertainty contributes to our second reason for declining to adopt the test of antecedent existence. At its logical extremes, the theory of antecedent existence could infringe upon constitutional and statutory mandates. The United States Constitution protects against state interference with contracts, *see* U.S. Const. art. I, § 10, cl. 1, and the Utah Constitution's open courts provision restricts the extent to which the state can limit common law remedies, *see* Utah Const. art. I, § 11. If the test of antecedent existence applies to venerable common law remedies such as breach of contract or malicious interference with contract, it might trench upon these constitutional provisions. Conversely, if the test of antecedent existence is limited to claims for discharge in violation of public policy, as suggested by a case in which the court applied the test to a claim of discharge in violation of public policy but failed to consider the test's possible application to the plaintiff's other common law claims, *see Bernstein*, 843 F.2d at 364–66, we cannot reconcile it with Utah's statutory mandate to construe liberally statutes in derogation of the common law, *see* Utah Code Ann. § 68–3–2. In sum, we are reluctant to adopt a test of uncertain scope when it may pose constitutional questions at one extreme and statutory questions at the other.

▮ We now turn to what we term the indispensable element test, which we adopt as the analytical model for determining when a legislative enactment supplies the exclusive remedy for a certain wrong. We think that the indispensable element model will avoid much of the vagueness and uncertainty that plague the *Davis* test and the test of antecedent existence. The indispensable element test relies on neither timing nor conduct to determine preemption.

---

statutory claim, i.e., that the UADA covers all sexual harassment, whether or not it is inflicted in a particularly egregious manner. Furthermore, recent critical commentary suggests that sexual harassment on the job always constitutes an intentional infliction of emotional distress. W. Page Keeton et al., *Prosser & Keeton on the*

*Law of Torts* § 12, at 18 (Supp.1988). If sexual harassment is per se outrageous and intolerable, it is difficult to see how the tort of intentional infliction of emotional distress can survive the *Davis* test. As this example illustrates, the *Davis* test is not a model of predictability or exactitude.

Instead, under this test, preemption depends on " 'the nature of the injury for which [the] plaintiff makes [the] claim, not the nature of the defendant's act which the plaintiff alleges to have been responsible for that injury.' " *Foley*, 413 N.E.2d at 716 (quoting *Gambrell*, 562 S.W.2d at 168).

An illustration is in order. In *Mounteer*, 823 P.2d 1055 (Utah 1991), in which we adopted the indispensable element test in the context of workers' compensation, we applied the test as follows: Initially, we identified the injury that the workers' compensation statute is designed to address, i.e., only physical and mental injuries on the job. *Id.* at 1057. Then we examined the elements of the plaintiff's tort claims against his employer to determine whether physical or mental injury was a necessary element of each cause of action. *Id.* at 1058–59. This inquiry led us to the following conclusions. First, we determined that the plaintiff's claim for slander did not require that the plaintiff prove physical or mental injury; it required defamation, or injury to reputation, which was not an injury the statute addressed. Consequently, we held that the nature of the injury was not among those injuries protected by the statute and therefore the

Workers' Compensation Act did not provide the exclusive remedy for the plaintiff's slander claim. *Id.* at 1058. Second, we determined that the plaintiff's claims for intentional and negligent infliction of emotional distress *did* require that the plaintiff prove mental injury because " 'mental harm is the essence' of [those] tort[s]." *Id.* (quoting *Foley*, 413 N.E.2d at 716); *see id.* at 1059. Because mental injury was among those injuries addressed by the statute and because the plaintiff could not prove intentional and negligent infliction of emotional distress without proving mental injury, we held that the Workers' Compensation Act provided the exclusive remedy for the plaintiff's mental distress.[8]

Applying this analysis to the case at hand, we begin with the task of determining what injuries the UADA is designed to address. This purpose is revealed on the face of the Act itself, which provides that it is a discriminatory or prohibited employment practice

> for an employer to refuse to hire, or promote, or to discharge, demote, terminate any person, or to retaliate against, or discriminate in matters of compensation or in terms, privileges, and condi-

---

8. Defendants have not argued that workers' compensation is the exclusive remedy for Retherford's claims of intentional infliction of emotional distress and negligent employment. However, we realize that the preceding discussion may raise questions about the application of the Workers' Compensation Act to the present case on remand. Therefore, we take this opportunity to clarify some potential areas of confusion. *See* Utah R.App.P. 30(a); *State v. James*, 819 P.2d 781, 795 (Utah 1991); *Reeves v. Gentile*, 813 P.2d 111, 119 (Utah 1991); *Hiltsley v. Ryder*, 738 P.2d 1024, 1026 (Utah 1987) (Zimmerman, J., concurring).

Regarding Retherford's claim against her fellow employees for intentional infliction of emotional distress, we have long held that an employee injured by the intentional tort of a fellow employee may sue the fellow employee personally. *See Bryan v. Utah Int'l*, 533 P.2d 892, 894 (Utah 1975). Therefore, the Workers' Compensation Act poses no bar to Retherford's suing her fellow employees for intentional torts.

However, the Act's applicability to Retherford's claim against AT & T for negligent employment is less clear. We have yet to address directly whether a plaintiff who is mentally or

physically injured by the intentional torts of a fellow employee can sue his or her employer for negligent employment or whether workers' compensation provides the exclusive remedy for the employer's negligence. Neither the Act itself nor judicial interpretations of it in Utah or elsewhere supply an explicit exception for the tort of negligent employment in such an instance. Our ruling in *Mounteer*, based as it is on an injury-oriented analysis rather than on an analysis centered on the legal theory of the claim, would suggest that workers' compensation would be an exclusive remedy. However, because the parties have neither raised nor briefed this issue, we decline to determine whether there is nonetheless some reason to allow the tort claim to go forward. In the event that this issue develops on remand, we do note that if *Mounteer* does not govern and workers' compensation does not supply an exclusive remedy, our previous case law may provide some guidance in determining AT & T's liability for Bateson–Hough's alleged intentionally tortious conduct. We have already determined that a managerial employee's tortious intent can be imputed to his or her employer under certain circumstances. *See Hodges v. Gibson Prods. Co.*, 811 P.2d 151, 157 (Utah 1991).

tions of employment against any person otherwise qualified, because of race, color, sex, age, if the individual is 40 years of age or older, religion, national origin, or handicap.

Utah Code Ann. § 34–35–6(1)(a)(i) (amended 1989). From this language, we infer that the legislature intended the UADA to address all manner of employment discrimination against any member of the specified protected groups. As discussed above, the legislature included employer retaliation for complaining of employment discrimination within its definition of discrimination. Thus, the next step in our analysis requires us to determine whether employment discrimination, including employer retaliation, supplies an indispensable element of any of Retherford's causes of action.

 We begin with Retherford's claim for discharge in violation of public policy. In order to prove this tort, Retherford must show that AT & T discharged her in a manner or for a reason that contravened a "clear and substantial public policy" of the State of Utah, a public policy rooted in Utah's constitution or statutes.[9] *Peterson*, 832 P.2d at 1281; *see also Berube*, 771 P.2d at 1051 (Zimmerman, J., concurring in the result). The only possible source in Utah's statutes or constitution for a clear and substantial public policy allegedly violated by Retherford's discharge is the UADA's prohibition of retaliation for good faith complaints of employment discrimination.[10] *See* Utah Code Ann. § 34–35–2(15). Without deciding that the statute at issue rises to the level of a clear and substantial public policy, we find that in the absence of this public policy declaration, Retherford would be unable even to allege an action for this tort. Simply put, if there were no UADA policy against retaliation, there could be no tort for discharge in violation of this public policy. Applying the *Mounteer* test, it is plain that the harm the UADA addresses is an indispensable element in Retherford's tort cause of action; therefore, the UADA must preempt this claim.

Moving to Retherford's other common law causes of action, the *Mounteer* analytical model leads to the conclusion that the UADA does not preempt these other causes of action because discrimination is not an indispensable element of these claims. A more detailed discussion of the elements of each of these claims is included in the analysis of the federal labor law preemption issue discussed below; however, for the purposes of determining the state law preemption question, it is enough to lay out the indispensable elements of Retherford's remaining claims and to note that none of them comprehends an injury that is the target of the UADA.

9. In determining whether a public policy is sufficiently "clear and substantial" to support a cause of action for discharge in violation of public policy, one must examine the strength of the policy as well as the extent to which it affects the public as a whole. The very words "clear and substantial" require a lack of ambiguity on both points. As the majority of this court recognized in *Peterson*, all statements made in a statute are not expressions of public policy. Many statutes merely regulate conduct between private individuals or " 'impose requirements whose fulfillment does not implicate fundamental public policy concerns.' " *Id.* at 1282 (quoting *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 217, 765 P.2d 373, 379 (1988)).

The following questions are relevant to determining whether a statute embodies a clear and substantial public policy. First, one must ask whether the policy in question is one of overarching importance to the public, as opposed to the parties only. Second, one must inquire whether the public interest is so strong and the policy so clear and weighty that we should place the policy beyond the reach of contract, thereby constituting a bar to discharge that parties cannot modify, even when freely willing and of equal bargaining power. Since these are the consequences of qualifying a policy as a basis for the tort action, these considerations should inform the evaluation of the policy itself. *See id.* at 1288 (Zimmerman, J., concurring and dissenting, joined by Hall, C.J.); *see also Foley,* 765 P.2d at 379–80 & n. 12.

10. The UADA defines retaliatory conduct as follows:

"Retaliate" means the taking of adverse action by an employer ... against one of its employees ... because he [or she] has opposed any employment practice prohibited under this chapter or because he [or she] has filed charges, testified, assisted, or participated in any way in any proceeding, investigation, or hearing under this chapter.

Utah Code Ann. § 34–35–2(15).

The elements of Retherford's claims are as follows: To prevail on a claim of breach of implied contract, Retherford must prove the existence of an implied contract, created by mutual assent, and AT & T's failure to comply with its terms.[11] *See Lowe v. Sorenson Research Co.*, 779 P.2d 668, 670 (Utah 1989); *Caldwell v. Ford, Bacon & Davis Utah, Inc.*, 777 P.2d 483, 485–86 (Utah 1989); *Berube*, 771 P.2d at 1044–45; *Gilmore v. Salt Lake Area Community Action Program*, 775 P.2d 940, 942–43 (Utah Ct.App.1989), *cert. denied*, 789 P.2d 33 (Utah 1990). To prevail on her claim of intentional infliction of emotional distress, Retherford must prove that her co-workers either intentionally or recklessly engaged in intolerable and outrageous conduct that caused her severe emotional distress. *See Samms v. Eccles*, 11 Utah 2d 289, 293, 358 P.2d 344, 346–47 (1961); *White v. Blackburn*, 787 P.2d 1315, 1317 (Utah Ct.App.1990). To prevail on her claim of malicious interference with contractual relations, Retherford must prove that her co-workers, whether separately or in conspiracy, intentionally and improperly persuaded AT & T to breach its implied employment contract with Retherford.[12] *See Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 301 (Utah 1982); *Bunnell v. Bills*, 13 Utah 2d 83, 90, 368 P.2d 597, 602 (1962). And to prevail on her claim of negligent employment, Retherford must prove that AT & T's negligence in hiring, supervising, or retaining its employees proximately caused her harm. *See Stone v. Hurst Lumber Co.*, 15 Utah 2d 49, 51–52, 386 P.2d 910, 911–12 (1963).

Noticeably absent from this list of the indispensable elements of the four claims is an injury that is a target of the UADA: retaliation for complaints of sexual harassment. While it is true that all four claims arise out of defendants' retaliatory conduct, preemption depends on the nature of the injury, not on the nature of the conduct allegedly responsible for that harm. *See Foley*, 413 N.E.2d at 716. The injuries Retherford alleges—the broken promise, the mental anguish, the wrongful interference with her contract, and the unchecked misconduct of her fellow employees—are distinct from the injury of retaliation. Because Retherford would be able to maintain these claims without alleging retaliatory harassment, we hold that under the *Mounteer* test, the UADA does not preempt Retherford's claims for breach of implied contract, intentional infliction of emotional distress, tortious interference with contract, and negligent employment.

Having determined that the UADA preempts only Retherford's claim for discharge in violation of public policy, we next address whether federal labor law

**11.** As discussed more fully above, the UADA does not preempt Retherford's cause of action for breach of implied contract because none of the indispensable elements of this claim implicates an injury targeted by the UADA. However, even if there were an overlap between the indispensable elements of the contract claim and the injury addressed by the statute, that overlap would not dispose of the question of preemption. When dealing with the realm of contracts, we must add another step to our preemption analysis. First, we must examine, as we do with all common law causes of action, whether the statute at issue supplies an indispensable element of the breach of contract claim. If not, our analysis is at an end. If so, we must proceed to the second step, applicable only to contract claims. This step is premised on the unique nature of contracts. Tort law embodies statements of public policy, and therefore it is appropriate for a statutory policy to preempt a judicially declared policy. Contracts, by contrast, involve voluntary private agreements that our society endows with the force of law. Before we can interfere with the enforcement of this private agreement, we must find that the private agreement offends the public policy embodied in the statute, offends it so severely that it requires striking the term or clause as unenforceable. Consequently, the second step for determining preemption of a contract claim is whether public policy forbids parties to contract on such a subject, for such a remedy, or in such a manner.

**12.** Retherford's complaint does not specify whether she is alleging interference with her collective bargaining agreement or with her contract implied from the code of conduct. Because the federal Labor Management Relations Act, 29 U.S.C. § 185(a), would preempt any claim that defendants interfered with Retherford's collective bargaining agreement, *see Wilkes–Barre Publishing Co. v. Newspaper Guild of Wilkes–Barre, Local 120*, 647 F.2d 372, 377–78 (3d Cir.1981), we interpret her complaint as alleging interference with her implied contract of employment.

preempts any of Retherford's remaining causes of action. We recap the substance of these remaining claims. Retherford alleges that, first, AT & T's failure to prevent retaliation for her complaints of sexual harassment breached a contract implied from AT & T's code of conduct; second, Gailey, Randall, Johnson, and Bateson–Hough maliciously interfered with her contractual relations, resulting in AT & T's breach of its implied contract prohibiting reprisal for good-faith complaints of sexual harassment; third, Gailey, Randall, Johnson, and Bateson–Hough intentionally inflicted emotional distress on her through their retaliatory conduct; and fourth, AT & T negligently employed Retherford's harassers, thereby allowing them to inflict emotional distress on her.

The legislative enactment that determines the federal preemption question is section 301 of the Labor Management Relations Act ("LMRA"), which reads as follows:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

Labor Management Relations (Taft–Hartley) Act, § 301(a), 29 U.S.C. § 185(a) [hereinafter section 301].

On its face, it is not apparent that section 301 preempts state law. *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 208, 105 S.Ct. 1904, 1909, 85 L.Ed.2d 206 (1985). However, the United States Supreme Court has interpreted section 301 as not only providing federal jurisdiction over controversies involving collective bargaining agreements, but also as vesting exclusive power in "federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements." *Textile Workers Union of Am. v. Lincoln Mills of Alabama,* 353 U.S. 448, 451, 77 S.Ct. 912, 915, 1 L.Ed.2d 972 (1957); *accord Allis–Chal-*

*mers Corp.,* 471 U.S. at 210, 105 S.Ct. at 1910; *Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.,* 369 U.S. 95, 103–04, 82 S.Ct. 571, 577, 7 L.Ed.2d 593 (1962); *see also Sperver v. Galigher Ash Co.,* 747 P.2d 1025, 1027 (Utah 1987).

The policy underlying this expansive interpretation of section 301 is well-founded. If the terms of collective bargaining agreements were subject to differing interpretations by state and federal courts, it could severely disrupt both the negotiation and the administration of collective bargaining agreements. *Lucas Flour Co.,* 369 U.S. at 103, 82 S.Ct. at 576. To avoid this possibility, the Court held that the meaning to be given to the terms of collective bargaining agreements must be determined exclusively by uniform federal law. *Id.* at 103–04, 82 S.Ct. at 577; *see Allis–Chalmers Corp.,* 471 U.S. at 210, 105 S.Ct. at 1910.

■ An elaboration on this doctrine of federal exclusivity in the interpretation of collective bargaining agreements is the Supreme Court's conclusion that section 301 preempts any common law cause of action where the trial court, in adjudicating that cause of action, must interpret the terms of a collective bargaining agreement. *See Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 405–06, 108 S.Ct. 1877, 1881, 100 L.Ed.2d 410 (1988). In essence, the Supreme Court has held that section 301 preempts any common law claim that is " 'substantially dependent on analysis of a collective bargaining agreement,' " *Caterpillar Inc. v. Williams,* 482 U.S. 386, 395, 107 S.Ct. 2425, 2431, 96 L.Ed.2d 318 (1987) (quoting *International Bhd. of Electric Workers, AFL–CIO v. Hechler,* 481 U.S. 851, 859 n. 3, 107 S.Ct. 2161, 2167 n. 3, 95 L.Ed.2d 791 (1987)), lest the common law provide a vehicle for state courts to intrude into the exclusive federal preserve that is the interpretation of collective bargaining agreements. The justification for this expansive view of section 301 preemption is the ease with which an aggrieved employee otherwise could turn a suit for breach of a collective bargaining agreement into a state tort or contract claim, thereby obtain-

ing a state law holding that might result in an inconsistent interpretation of the collective bargaining agreement. As the Court has explained:

> The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract.

*Allis–Chalmers Corp.*, 471 U.S. at 211, 105 S.Ct. at 1911.

█ The question before us, then, is whether resolution of the state law claim depends upon the interpretation of the collective bargaining agreement. If it does, section 301 preempts the state law cause of action. *Lingle*, 486 U.S. at 405–06, 108 S.Ct. at 1881. However, "even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Id.* at 409–10, 108 S.Ct. at 1883. Under such circumstances, there is no section 301 preemption.

█ Defendants argue that the *Lingle* test bars Retherford's claims of breach of implied contract, tortious interference with contract, intentional infliction of emotional distress, and negligent employment because evaluation of the state claims is "inextricably intertwined with consideration of the terms of the labor contract." In order to determine whether resolution of Rether-

ford's claims indeed depends upon the meaning of the collective bargaining agreement, we must examine the discrete elements of each claim. *See Douglas v. American Info. Technologies Corp.*, 877 F.2d 565, 570 (7th Cir.1989).

We first address Retherford's claim for breach of implied contract. Defendants argue that section 301 bars Retherford's implied contract claim because the state court must interpret the collective bargaining agreement in order to determine whether the AT & T code of conduct upon which the claim is based is separate from or subsumed into the collective bargaining agreement. We hold that Retherford's implied contract claim is inactionable, but on somewhat different grounds. *See Hill v. Seattle First Nat'l Bank*, 827 P.2d 241, 246 (Utah 1992).

Under federal labor law, only duly authorized union representatives can bargain for the terms and conditions of employment for those within the bargaining unit. *See* 29 U.S.C. § 159(a); *cf. Caterpillar Inc.*, 482 U.S. at 397, 107 S.Ct. at 2432. The Supreme Court has held that although any employee or group of employees can reach a separate agreement with the employer, that separate contract must be consistent with the collective bargaining agreement negotiated by the union. *J.I. Case Co. v. NLRB*, 321 U.S. 332, 339, 64 S.Ct. 576, 581, 88 L.Ed. 762 (1944); *see also NLRB v. Allis–Chalmers Mfg. Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123, *reh'g denied*, 389 U.S. 892, 88 S.Ct. 13, 19 L.Ed.2d 202 (1967). Thus, inconsistent separate agreements are not enforceable. *See Eitmann v. New Orleans Pub. Serv., Inc.*, 730 F.2d 359, 362 (5th Cir.), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984).

In applying this rule, at least two federal circuits have found unenforceable separate agreements that were more favorable to the individual employees than the collective bargaining agreement. *See Chmiel v. Beverly Wilshire Hotel Co.*, 873 F.2d 1283, 1285–86 (9th Cir.1989); *Eitmann*, 730 F.2d at 362–63. For example, the Ninth Circuit has held that an employee whose collective

bargaining agreement defined his tenure as at-will could not enforce an implied contract for just-cause dismissal because the extra protections would contradict the collective bargaining agreement. *See Chmiel*, 873 F.2d at 1285.

We think that the policy underlying these decisions is sound. Nothing could undermine the authority of the collective bargaining unit more thoroughly than allowing individuals or cohorts of employees to enforce separate contracts that were more advantageous to those employees than was the collective bargaining agreement itself. Although the interests of individual employees may be slighted in the process, Congress apparently is of the view that such sacrifices are necessary in order to match the power of the employer with the aggregate power of unionized employees. *Cf. Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 146, 96 S.Ct. 2548, 2556, 49 L.Ed.2d 396 (1976); *Allis–Chalmers Mfg. Co.*, 388 U.S. at 180, 87 S.Ct. at 2006; *J.I. Case*, 321 U.S. at 338–39, 64 S.Ct. at 581. *See generally* Annotation, *Collective Bargaining Under Labor Relations Act as Related to Freedom of Contract Between Employer and Individual Employees*, 88 L.Ed. 770 (1944). Accordingly, we decline to upset this balance by allowing individual agreements to undercut the union as the bargaining agent. In the instant case, providing any remedy under an implied contract when no remedy is available under the collective bargaining agreement—because the time for arbitration has passed—obviously would put Retherford in a more advantageous position than AT & T employees bound by the collective bargaining agreement, thereby undermining the collective bargaining unit. Consequently, Retherford's alleged implied contract is unenforceable.

Our holding that Retherford's implied contract is invalid requires us to find that her claim for malicious interference with contract is similarly defective. Although some courts have held that the contract at issue in a case for malicious interference need not be enforceable, courts generally agree that the contract must not be illegal or contrary to public policy. *See generally* 45 Am.Jur.2d *Interference* §§ 8–9 (1969 & Supp.1992). Allowing a plaintiff to sue for malicious interference with a contract that is invalid would gut the federal policy of consolidating bargaining power in union representatives. Consequently, we affirm the summary judgment on Retherford's claim for malicious interference with contract, albeit on grounds different from those relied upon by the trial court.

Having determined that the LMRA bars Retherford's claims stemming from her implied contract, we next consider her tort claims for intentional infliction of emotional distress and negligent employment. We begin with her claim for emotional distress because AT & T can be held liable for negligent employment only if its employees Randall, Johnson, Gailey,[13] and Bateson–Hough are liable for an independent tort. *See Focke v. United States*, 597 F.Supp. 1325, 1344 (D.Kan.1982); *Mulhern v. City of Scottsdale*, 165 Ariz. 395, 799 P.2d 15, 18 (Ct.App.1990). *See generally* Restatement (Second) of Agency § 213 (1958). Here, Retherford alleges that AT & T's employees committed the tort of intentional infliction of emotional distress.

To sustain her claim for intentional infliction of emotional distress, Retherford must show that (i) Gailey's, Randall's, Johnson's, and Bateson–Hough's conduct was outrageous and intolerable in that it offended against the generally accepted standards of decency and morality; (ii) they intended to cause, or acted in reckless disregard of the likelihood of causing, emo-

---

**13.** Although Retherford stipulated to Gailey's dismissal upon Gailey's declaration of bankruptcy, Gailey's absence from this suit does not affect Retherford's ability to prove Gailey's tortious conduct in order to find AT & T liable for negligent employment. It merely prevents Retherford from seeking damages from Gailey personally. Any finding that Gailey engaged in tortious conduct would, of course, have no preclusive effect in a subsequent suit against Gailey herself.

tional distress; (iii) Retherford suffered severe emotional distress; and (iv) their conduct proximately caused Retherford's emotional distress. *See Samms v. Eccles*, 11 Utah 2d 289, 293, 358 P.2d 344, 346–47 (1961); *White v. Blackburn*, 787 P.2d 1315, 1317 (Utah Ct.App.1990). To decide whether this tort claim is preempted, we must determine whether, on the record before us, there is any basis for concluding that defendants' conduct alleged to provide a basis for the tort claim might reasonably implicate any of the terms of the collective bargaining agreement. *See Lingle*, 486 U.S. at 405–06, 108 S.Ct. at 1881.

A necessary element of Retherford's claim is that Bateson–Hough's, Gailey's, Randall's, and Johnson's behavior was outrageous and intolerable in that it offended against the generally accepted standards of decency and morality. *See Samms*, 11 Utah 2d at 293, 358 P.2d at 347. Before analyzing this tort under the test for section 301 preemption, it is helpful to identify the conduct that Retherford alleges. Retherford details the conduct of each co-worker as follows: With respect to Bateson–Hough, Retherford contends that Bateson–Hough responded to her complaining of sexual harassment by requiring her to sit next to Gailey, telling her she had a letter sanctioning her and Gailey, assigning her to certain "slow" work stations that hampered her productivity, reprimanding and criticizing her, and threatening to fire her if she continued to complain about Gailey.

As for Gailey, Retherford alleges that Gailey avenged Retherford's complaint to the AT & T EEO coordinator by following her, making threatening faces at her, and speeding by her late at night when she was trying to cross the street.[14] As for Randall, Retherford charges that Randall told her she must report to Boise within ten days or lose her job. In addition, although the record is ambiguous, Randall may have been among Gailey's friends who retaliated against Retherford by staring at her, making "threatening facial expressions" at her, walking extremely close to her, and follow-

ing her around the office. Finally, Johnson also may have been among the group of Gailey's friends who discomfited Retherford by their staring and their threatening facial expressions. The record shows that on at least one occasion, Johnson accused Retherford of staring at her. Retherford also alleges that in her presence, Johnson and others lamented the fact that someone was watching them and would report them if they broke company rules. After one such comment, Johnson looked at Retherford and said, "Isn't that right, Debi?" Viewing the facts in the light most favorable to Retherford, as we must, *see Rollins v. Petersen*, 813 P.2d 1156, 1158 (Utah 1991), we accept for the purposes of this appeal that Retherford has alleged at least that Randall and Johnson made a habit of following her and mocking her after she complained of Gailey's sexual harassment.

Defendants argue that section 301 preempts Retherford's claims of intentional infliction of emotional distress because a court deciding whether this conduct was intolerable and outrageous must interpret the collective bargaining agreement to determine whether Bateson–Hough exceeded her supervisory authority and whether Gailey's, Randall's, and Johnson's work-place conduct was improper. We agree in part.

In considering section 301 preemption of tort claims alleging infliction of emotional distress by a supervisor or fellow employee, courts seem to have distinguished between situations in which the defendant has misused his or her authority under a collective bargaining agreement to torment the plaintiff and situations in which the defendant has inflicted the distress through conduct that is purely personal and does not implicate the exercise of supervisory authority. *See Paradis v. United Technologies Pratt & Whitney Div.*, 672 F.Supp. 67, 71 (D.Conn.1987). *Compare Douglas*, 877 F.2d at 571–72 *and Newberry v. Pacific Racing Ass'n*, 854 F.2d 1142, 1149–50 (9th Cir.1988) *and Truex v. Garrett Freightlines, Inc.*, 784 F.2d 1347, 1350–51 (9th Cir.1985) *with*

---

**14.** Because Retherford claims only retaliatory harassment, not sexual harassment, we will not consider evidence of Gailey's unwelcome sexual advances.

*Keehr v. Consolidated Freightways of Delaware, Inc.*, 825 F.2d 133, 136–38 (7th Cir.1987) *and Tellez v. Pacific Gas & Elec. Co.*, 817 F.2d 536, 539–40 (9th Cir.), *cert. denied*, 484 U.S. 908, 108 S.Ct. 251, 98 L.Ed.2d 209 (1987) *and Garibaldi v. Lucky Food Stores, Inc.*, 726 F.2d 1367, 1369 n. 4 (9th Cir.1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2319, 85 L.Ed.2d 839 (1985).

The *Douglas* and *Keehr* cases, both from the Seventh Circuit, illustrate this distinction. In *Douglas*, the plaintiff charged her employer with "extreme and outrageous" treatment because of the employer's allegedly arbitrary denials of her requests for days off, an "unjustified" final warning, and "unwarranted and excessive" scrutiny of her work. 877 F.2d at 572. The Seventh Circuit concluded that a state court would have to interpret the collective bargaining agreement's provisions regulating the terms and conditions of the plaintiff's employment to determine whether the employer's actions were indeed arbitrary, unjustified, unwarranted, and excessive. It therefore held that section 301 barred Douglas's state tort claim. *Id.* at 572–73.

In contrast, the *Keehr* court found that section 301 did not preempt a claim for intentional infliction of emotional distress. There, Keehr complained that a company supervisor had engaged him in an altercation during which the supervisor allegedly made outrageous comments about the sexual activities of Keehr's wife, and the verbal abuse escalated into a fist fight. 825 F.2d at 135. The court reasoned that there was no section 301 preemption because the supervisor's abuse of the employee could not reasonably be seen as implicating the supervisor's authority under the collective bargaining agreement, even though it would have been possible for Keehr to file a grievance against his supervisor for using abusive language. *Id.* at 137–38.

We find that this distinction has merit and apply it to Retherford's emotional distress claim. Retherford's allegations that Randall ordered her to report to Boise within ten days or lose her job and that Bateson–Hough reprimanded Retherford, warned her to stop complaining, told her where to sit, and assigned her certain tasks raise questions about their respective authority under the collective bargaining agreement. Therefore, to the extent that this conduct constitutes a ground for the claim of intentional infliction of emotional distress, section 301 preempts Retherford's cause of action.

However, other allegations regarding the conduct of Gailey, Randall, and Johnson can withstand the section 301 preemption analysis. Specifically, Retherford alleges that Gailey responded to Retherford's complaint to the AT & T EEO coordinator with conduct ranging from following her around the office to attempting to frighten her as she crossed the street. She alleges that Randall and Johnson retaliated by following her and making threatening faces at her. Such alleged behavior raises issues of purely personal misconduct. Evaluating the severity and the consequences of this conduct in order to adjudicate Retherford's claim of intentional infliction of emotional distress should require no interpretation of the collective bargaining agreement. These allegations are analogous to those in *Keehr*, not to those in *Douglas*. To the extent that Retherford's tort claim is premised upon allegations of purely personal misconduct, as opposed to misconduct under color of possible contractual authority, section 301 does not preempt the cause of action.

■ Having determined that Gailey, Johnson, and Randall may be held liable for the tort of intentional infliction of emotional distress without implicating the collective bargaining agreement, we turn to the question of whether Retherford can hold AT & T liable for Gailey's, Johnson's, and Randall's behavior under a theory of negligent employment without running afoul of section 301 preemption. The issue is whether, in determining AT & T's liability under this claim, a court could avoid determining any issue that would implicate the collective bargaining agreement.

■ Negligent employment is a tort of some novelty in Utah. Although we have recognized this cause of action, *see Clover v. Snowbird Ski Resort*, 808 P.2d 1037,

1048 (Utah 1991); *Birkner v. Salt Lake County*, 771 P.2d 1053, 1059 (Utah 1989), *Stone v. Hurst Lumber Co.*, 15 Utah 2d 49, 51, 386 P.2d 910, 911–12 (1963), our cases do not describe its elements in detail. Consequently, we look to other jurisdictions to provide a detailed description of this tort. To prevail on her claim of negligent employment against AT & T, Retherford must show that (i) AT & T knew or should have known that its employees posed a foreseeable risk of retaliatory harassment to third parties, including fellow employees; (ii) the employees did indeed inflict such harm; and (iii) the employer's negligence in hiring, supervising, or retaining the employees proximately caused the injury.[15] *See, e.g., Pruitt v. Pavelin*, 141 Ariz. 195, 685 P.2d 1347, 1354–55 (Ct.App.1984); *Kassman v. Busfield Enters., Inc.*, 131 Ariz. 163, 639 P.2d 353, 356–57 (Ct.App.1981); *Najera v. Southern Pac. Co.*, 191 Cal.App.2d 634, 13 Cal.Rptr. 146, 149 & n. 3 (1961); *Destefano v. Grabrian*, 763 P.2d 275, 287–88 (Colo. 1988); *Tatham v. Wabash R.R.*, 412 Ill. 568, 107 N.E.2d 735, 739 (1952); *Plains Resources, Inc. v. Gable*, 235 Kan. 580, 682 P.2d 653, 662 (1984); *LaBonte v. National Gypsum Co.*, 113 N.H. 678, 313 A.2d 403, 405 (1973); *F & T Co. v. Woods*, 92 N.M. 697, 594 P.2d 745, 746–49 (1979); *Valdez v. Warner*, 106 N.M. 305, 742 P.2d 517, 519–20 (Ct.App.), *cert. quashed sub nom. Z & E, Inc. v. Valdez*, 106 N.M. 353, 742 P.2d 1058 (1987); *Pittard v. Four Seasons Motor Inn, Inc.*, 101 N.M. 723, 688 P.2d 333, 339–41 (Ct.App.), *writ quashed*, 101 N.M. 555, 685 P.2d 963 (1984); *Kelley v. Oregon Shipbuilding Corp.*, 183 Or. 1, 189 P.2d 105, 106–07 (1948); *Chesterman v. Barmon*, 82 Or.App. 1, 727 P.2d 130, 131–32,

*aff'd and remanded*, 305 Or. 439, 753 P.2d 404 (1988); *Dempsey v. Walso Bureau, Inc.*, 431 Pa. 562, 246 A.2d 418, 419–22 (1968); *Banks v. Nordstrom, Inc.*, 57 Wash.App. 251, 787 P.2d 953, 960 (1990). *See generally* Kenneth R. Wallentine, *Negligent Hiring: The Dual Sting of Pre–Employment Investigation*, Utah Bar Journal, October 1989, at 15; Donald K. Armstrong, *Negligent Hiring and Negligent Entrustment: The Case Against Exclusion*, 52 Or.L.Rev. 296, 298–300 (1973); Restatement (Second) of Agency § 213 (1958); Restatement (Second) of Torts § 317 (1965).

For the purposes of this discussion, we will assume that Retherford can prove that Gailey, Randall, and Johnson intentionally inflicted emotional distress upon her. Also we note that because the tort of negligent employment can impose liability on the employer even when the employer would not otherwise be liable under the doctrine of respondeat superior, we have no need to consult the collective bargaining agreement to determine whether Gailey, Randall, and Johnson were acting in the scope of their employment. *See Clover*, 808 P.2d at 1048; *Birkner*, 771 P.2d at 1059.

Defendants argue that a state court cannot determine the elements of the tort—i.e., that AT & T knew or reasonably should have known that Gailey, Randall, and Johnson posed a hazard of such tortious conduct and could have taken steps to avoid this hazard—without referring to any provision of the collective bargaining agreement. Defendants insist that the court will have to resort to the collective bargaining agreement's termination and discipline provisions to determine whether

---

**15.** Because the tort of negligent employment has received little explication in our cases, we take this opportunity to provide some background. The causes of action variously termed "negligent hiring," "negligent supervision," and "negligent retention" are all basically subsets of the general tort of negligent employment. *See generally* 53 Am.Jur.2d *Master and Servant* §§ 212, 422 (1970 & Supp.1992). These variants differ only in that they arise at different points in the employment relationship. By way of illustration only, we offer the following: a day-care provider who knowingly or negligently hires a convicted child molester might be liable

for negligent hiring, *see Broderick v. King's Way Assembly of God Church*, 808 P.2d 1211, 1221 (Alaska 1991), while a day-care provider who unwittingly hires a convicted child molester but retains him or her once his or her record and proclivities become apparent might risk liability for negligent retention. In both instances, once the day-care provider knows of the child molester's background, it might be liable for negligent supervision if it allows him or her unsupervised interaction with the children in its care. *See generally* Restatement (Second) of Agency § 213 (1958).

AT & T acted "appropriately" in dealing with Gailey, Johnson, and Randall. We cannot agree that the record before us makes clear that the trial court must resort to the collective bargaining agreement to adjudicate this claim.

In analyzing this issue, we first note that AT & T misunderstands the source of its duty to control the conduct of its employees. AT & T suggests that this obligation arises from the collective bargaining agreement. This is incorrect. The employer's duty toward those people whom its employees place in a position of reasonably foreseeable risk or injury does not stem from its private employment contract. *Cf. Valdez*, 742 P.2d at 519. Instead, it is a duty imposed by the common law of the state. The common law of tort expresses public policy, the scope of which is not generally determined by reference to privately contracted obligations. Certainly, we may vindicate some public policies by implying them as covenants to private contracts. *See, e.g., Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985). However, such covenants are judicial creations that express public policy and constitute public law; they are not private agreements between private parties, and they are not avoidable by contract. *See id.* at 801 n. 4.

In the present case, the duty that Retherford relies upon arises from the public law of tort, not from the private collective bargaining agreement. Therefore, the existence of the duty and the determination of its scope do not require resort to any term of the collective bargaining agreement. Other duties might be due to Retherford and other employees by reason of the collective bargaining agreement, but their existence is not relevant to the duty inquiry for purposes of the tort of negligent employment.

It is true, however, that in an action for negligent employment, the plaintiff must show that the employer's failure to fulfill the duty owed the injured party in hiring, supervising, or retaining the malfeasing employee proximately caused the injury of which the plaintiff complains. In making this factual determination, a court might have to resort to the collective bargaining agreement to discover whether contractual limitations on the power of the employer to deal with the employee precluded it from taking steps to prevent the harm. Although such an eventuality might raise questions of section 301 preemption, the defendants in the present case have made no showing that the trial court, in adjudicating this particular matter, would have to refer to the collective bargaining agreement to determine whether AT & T could have prevented Gailey's, Johnson's, and Randall's allegedly tortious acts. It is not enough that we might imagine a situation where a court might have to make such a reference. There must be a realistic possibility that it may occur. Because defendants have not shown any such realistic possibility, we hold that there is no section 301 preemption of the claim for negligent employment.[16]

To summarize the preemptive effects of state and federal statutes on Retherford's claims, the UADA preempts only Retherford's claim for discharge in violation of public policy, while the LMRA preempts Retherford's claims for breach of implied contract and malicious interference with contract and partially preempts her claim for intentional infliction of emotional distress. We therefore affirm the trial court's summary judgment against Retherford on those preempted claims. The only claims to survive state and federal preemption are Retherford's claim for negligent employment and the part of her emotional distress claim that alleges purely personal misconduct on the part of Gailey, Johnson, and Randall.

We now examine defendants' objections to Retherford's nonpreempted causes of ac-

---

16. As this case develops on remand, it may become apparent that the trial court may have to resort to the terms of the collective bargaining agreement. If this occurs, defendants are free to raise the question of preemption with the trial court, which should determine the issue.

If the court finds section 301 preemption, the preempted portion of the claim must be dismissed. Today, we hold only that it is improper to find preemption on the basis of unsupported speculation as to how a case may evolve.

tion for intentional infliction of emotional distress and negligent employment. First, defendants argue that Retherford's claims of negligent employment and intentional infliction of emotional distress are untimely. Second, they argue that the conduct alleged is insufficient as a matter of law to support a cause of action for intentional infliction of emotional distress. We discuss these arguments in turn.

Defendants base their untimeliness contention on section 78–12–25(3)'s four-year period of limitations. *See* Utah Code Ann. § 78–12–25(3). Defendants argue that the four years began to run May 10, 1984, when Retherford's submission of a written complaint to the AT & T EEO coordinator first indicated that she thought she was being harassed. Because more than four years had elapsed by April 7, 1989, when Retherford filed her state action, defendants claim that she failed to file her claims of negligent employment and intentional infliction of emotional distress in a timely manner. We disagree.

■ The question presented is whether, taking the facts in a light most favorable to Retherford, the statute of limitations ran before April 7, 1989. Defendants contend that as a matter of law, the statute began to run at the time of the first complaint. Under Utah law, the statute of limitations begins to run when the cause of action accrues. *See id.* § 78–12–1; *Davidson Lumber Sales, Inc. v. Bonneville Inv., Inc.*, 794 P.2d 11, 19 (Utah 1990). A tort cause of action accrues when all its elements come into being and the claim is actionable. *Davidson Lumber Sales, Inc.*, 794 P.2d at 19; *see State Tax Comm'n v. Spanish Fork*, 99 Utah 177, 181, 100 P.2d 575, 577 (1940). In order to determine when the limitations period began to run, then, we must determine when each of the causes of action became actionable in the courts.

■ We begin with Retherford's claim of intentional infliction of emotional distress. Because of the nature of this cause of action, it can be difficult to determine when all its elements—intentional, outrageous conduct proximately causing ex-

treme distress—have come into being. Of particular difficulty is the element of injury—extreme emotional distress. Sometimes, to be sure, a single outrageous incident, such as an egregiously vicious practical joke, *see* Restatement (Second) of Torts § 46 cmt. d, illus. 1 (1965), results in immediate and easily identifiable emotional distress. Often, however, emotional distress does not so much occur as *unfold*—for example, where a defendant subjects a plaintiff, not to a single outrageous act, but to a pattern or practice of acts tolerable by themselves though clearly intolerable in the aggregate.

■ Here, Retherford alleges a pattern of retaliatory harassment. Such patterns present courts with the difficult task of identifying when during a series of related acts the element of emotional distress "occurred." We have been unable to locate authority that is directly on point concerning the application of statutes of limitation to a pattern of conduct that constitutes, in the aggregate, intentional infliction of emotional distress. However, we find the treatment of claims of alienation of affections instructive in this regard. In adjudicating such claims, which often allege a series of wrongful acts over a substantial period of time, courts have determined that the statute of limitations begins to run when the alienation is accomplished, i.e., when love and affection are finally lost. *See e.g., Gibson v. Gibson*, 244 Ark. 327, 424 S.W.2d 871, 874 (1968); *Dobrient v. Ciskowski*, 54 Wis.2d 419, 195 N.W.2d 449, 451 (1972); *see also Flink v. Simpson*, 49 Wash.2d 639, 305 P.2d 803, 804 (1957); *Strode v. Gleason*, 9 Wash.App. 13, 510 P.2d 250, 254 (1973). Applying this standard by analogy, we hold that the statute of limitations for intentional infliction of emotional distress does not begin to run until the distress is actually inflicted, i.e., when the plaintiff suffers severe emotional disturbance.

■ Although easy to describe, this standard is difficult to apply, particularly because the element of emotional distress is specific to the plaintiff in each case. Because the tort of intentional infliction of

emotional distress requires *actual* emotional distress, *see* Restatement (Second) of Torts § 46(1) (1965), this element is to be gauged subjectively.[17] A particularly hardy or calloused plaintiff may never accrue a cause of action for intentional infliction of emotional distress, even though he or she is subjected to outrageous conduct that no reasonable person could be expected to bear. Consequently, our task is to determine when, given these allegations, Retherford experienced severe emotional distress, not when an ordinarily sensitive person would have experienced such suffering.

The record before us identifies this moment.[18] In September of 1985, after almost eighteen months of retaliatory abuse by her co-workers, during which she re-peatedly sought assistance from her immediate supervisors, the AT & T EEO coordinator, and the EEOC, Retherford took medical disability leave at the instance of her psychiatrist. She never returned to her job because, physically and emotionally, she could not work in proximity to "the people who started the panic in her." Retherford's dramatic steps of taking leave from her job, seeking medical and psychiatric attention to heal the stresses of her work place, and remaining on leave for approximately six months because she could not bring herself to face her harassers all support a factual inference that the element of extreme emotional distress did not come into existence before September of 1985.

17. For the guidance of the bench and bar, we make clear that while the standard for determining whether a plaintiff has experienced emotional distress is subjective, the standard for determining the outrageousness of the alleged conduct is objective. Consequently, a plaintiff claiming intentional infliction of emotional distress must show both that a reasonable person would consider the alleged conduct to be outrageous and that the plaintiff actually experienced subjective severe emotional anguish because of this objectively outrageous conduct.

18. We realize that not all cases will reveal so clearly the point at which the plaintiffs actually experienced emotional distress. Although we do not at this time adopt their analysis, we note that courts facing similar difficulties in adjudicating Title VII claims, *see* 42 U.S.C. § 2000e–2, have enunciated a theory of continuing violation in order to allow plaintiffs to recover for patterns of employment discrimination. Like intentional infliction of emotional distress, employment discrimination often manifests itself as a series of small wrongful acts instead of one dramatic injustice. Indeed, changing attitudes toward minorities and women in the work place may have contributed to the incidence of long-term patterns of employment discrimination because as social opprobrium of racial and sexual harassment has increased, people may have become more subtle in acting on or expressing their prejudices. While a defendant may be able to dismiss separate acts of subtle discrimination as merely coincidences or attempts at humor, an examination of these acts as a whole often will reveal their underlying pattern of malignity. To address these patterns, courts adjudicating Title VII claims allow recovery for an entire pattern of employment discrimination so long as one act of the continuing violation occurs within the statute of limitations period. *See, e.g., Berry v. Board of Supervisors of L.S.U.,* 715 F.2d 971, 979 (5th Cir.1983); *Nelson v.* *Williams,* 25 Fair Empl.Prac.Cas. (BNA) 1214, 1215 (D.D.C.1981); *Williams v. Atchison, Topeka & Santa Fe Ry.,* 627 F.Supp. 752, 756–57 (W.D.Mo.1986); *Tarvesian v. Carr Div. of TRW, Inc.,* 407 F.Supp. 336, 339 (D.Mass.1976); *Loo v. Gerarge,* 374 F.Supp. 1338, 1340 (D.Haw.1974); *Sciaraffa v. Oxford Paper Co.,* 310 F.Supp. 891, 896 (D.Me.1970); *Johnson v. Ramsey County,* 424 N.W.2d 800, 810 (Minn.Ct.App.1988). At least one state has adopted the Title VII continuing violation theory for causes of action brought under the state's antidiscrimination act, *see Sumner v. Goodyear Tire & Rubber Co.,* 427 Mich. 505, 398 N.W.2d 368, 380–81 (1986), and at least two states have codified the Title VII continuing violation theory in their administrative regulations governing employment, *see Hy-Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n,* 453 N.W.2d 512, 527 (Iowa 1990); *Rock v. Massachusetts Comm'n Against Discrimination,* 384 Mass. 198, 424 N.E.2d 244, 248 & nn. 12–13 (1981).

In determining the existence of a continuing violation, courts focus on the following factors, which are relevant to, but not dispositive of, the existence of, a continuing violation:
> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Berry,* 715 F.2d at 981.

This is sufficient to support the conclusion that the statute had not run by April of 1989, when the action was filed.

Of course, at trial defendants will have the opportunity to prove to the satisfaction of the finder of fact that the element of extreme emotional distress accrued some time before Retherford's leave of absence. However, on the facts before us, we cannot say as a matter of law that it accrued before April of 1985. Consequently, the four-year statute of limitations poses no bar to Retherford's recovery for defendants' entire course of conduct. *See* Utah Code Ann. § 78–12–25(3).

■ The next question is whether Retherford's claim for negligent employment also was filed within the four-year statute of limitations. Before an employer can be found liable for negligent employment, one of its employees must have committed a tort. *See Mulhern v. City of Scottsdale,* 165 Ariz. 395, 799 P.2d 15, 18 (Ct.App. 1990); Restatement (Second) of Agency § 213 cmt. a (1958). Thus, as a general matter, the statute of limitations will not begin to run on a cause of action for negligent employment until all elements of the employee's tort are present. However, although the tort of negligent employment requires the employee's tort as a condition precedent, we note that in situations where the victim does not accrue a cause of action until she or he suffers a subjective harm, it may be contended that the employer's breach of duty has become evident long before that point, i.e., that the conduct element of the tort, the employee malfeasance, has become sufficiently apparent that the employer should have taken steps

to correct it, even before the victim has fully accrued a cause of action. As a consequence, one might argue that the statute of limitations against the employer for negligent employment should begin to run before the statute begins to run on the tort by the employee. Such a situation might exist where, as here, the victim alleges intentional infliction of emotional distress.

We need not decide today whether such an argument has merit or whether it applies to the facts of this case. Defendants did not advance the argument before this court or the trial court, we have found no legal authority that speaks to the issue, and most important, the record provides no basis for our concluding as a matter of law that if the cause of action against AT & T for negligent supervision did accrue before the cause of action against the employees, all this occurred before April of 1985. There is therefore no basis for sustaining a summary judgment on the ground that the four-year statute of limitations bars the negligent employment claim. *See* Utah Code Ann. § 78–12–25(3).

■ As a final objection to Retherford's claim of intentional infliction of emotional distress against Randall and Johnson, defendants argue that the conduct alleged is insufficiently outrageous and intolerable to support such a claim. We disagree. The standard Utah has adopted for determining whether the conduct of a defendant is sufficiently offensive to permit recovery is whether the defendant's actions "offend against the generally accepted standards of decency and morality." [19]

---

**19.** Although *Samms v. Eccles* cites the second Restatement of Torts in support of this standard, *see* 11 Utah 2d 289, 293 n. 14, 358 P.2d 344, 347 n. 14 (1961), we note that *Samms* states a somewhat different threshold for outrageousness than does the Restatement. The Restatement requires that the conduct at issue be "extreme and outrageous," which it describes as "so outrageous in character, and so extreme in degree, as to go *beyond all possible bounds* of decency." Restatement (Second) of Torts § 46, cmt. d (1965). On the other hand, *Samms* holds that conduct is considered "outrageous and intolerable" if it offends against "the *generally accepted standards* of decency and morality."

11 Utah 2d at 293, 358 P.2d at 347 (emphasis added).

 We have reviewed *Samms* and our subsequent cases dealing with intentional infliction of emotional distress and have found no evidence whatsoever that the court intended to weaken the Restatement's standard by this formulation. *Cf. Pentecost v. Harward,* 699 P.2d 696, 700 (Utah 1985) (citing both *Samms* and the Restatement without mentioning distinction). Moreover, although we recognize a theoretical difference between conduct that transgresses "all possible bounds of decency" and conduct that transgresses only "generally accepted standards of decency," we believe that in applica-

978

*Samms v. Eccles*, 11 Utah 2d 289, 293, 358 P.2d 344, 347 (1961).

Applying this standard to the facts at bar and viewing those facts in a light most favorable to plaintiff, we can say as a matter of law that Retherford has alleged outrageous and intolerable conduct sufficient to support a cause of action for intentional infliction of emotional distress. Certainly, as defendants claim, merely following or making faces at someone, without more, does not constitute conduct of such objective offensiveness that it can give rise to a claim of intentional infliction of emotional distress. However, Retherford alleges more than simple insult or annoyance. She alleges months of persecution by her co-workers, during which Gailey, Johnson, and Randall shadowed her movements, intimidated her with threatening looks and remarks, and manipulated circumstances at her work in ways that made her job markedly more stressful, all in retaliation for her good-faith complaint of sexual harassment. Indulging all inferences in favor of Retherford, as we must, *Rollins v. Petersen*, 813 P.2d 1156, 1158 (Utah 1991), such allegations are sufficient to satisfy the objective conduct requirement of the tort of intentional infliction of emotional distress.

It is worth stating forcefully that any other conclusion would amount to an intolerable refusal to recognize that our society has ceased seeing sexual harassment in the work place as a playful inevitability that should be taken in good spirits and has awakened to the fact that sexual harassment has a corrosive effect on those who engage in it as well as those who are subjected to it and that such harassment has far more to do with the abusive exercise of one person's power over another

than it does with sex. *See, e.g.,* Louise F. Fitzgerald, *Science v. Myth: The Failure of Reason in the Clarence Thomas Hearings,* 65 S.Cal.L.Rev. 1399, 1399 (1992); Carol Sanger, *The Reasonable Woman and the Ordinary Man,* 65 S.Cal.L.Rev. 1411, 1415 (1992). This consensus extends into all sectors of our society. Indeed, although Utah Senator Orrin Hatch never wavered from his conviction that law professor Anita Hill had fabricated her allegations that Supreme Court nominee Clarence Thomas had sexually harassed her, he reportedly condemned the alleged conduct in the strongest terms. Someone who would make such vulgar and degrading comments "would not be a normal person," Senator Hatch said. "That person ... would be a psychopathic sex fiend or a pervert." Fitzgerald at 1405.

As Senator Hatch recognized, sexual harassment is simply unacceptable in today's society. To refuse to label the retaliatory conduct alleged here as outrageous and intolerable would be a travesty. Prosser and Keeton quite properly call sexual harassment on the job "undoubtedly an intentional infliction of emotional distress." W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 12, at 18 (Supp. 1988). By this, we take them to mean that the conduct generally labeled sexual harassment is outrageous and intolerable and, when performed with the requisite intent, satisfies the elements of the tort of intentional infliction of emotional distress. If the conduct that constitutes sexual harassment is per se outrageous and intolerable, it stands to reason that retaliation for complaining of sexual harassment must also be considered outrageous and intolerable. Retherford has stated a claim for

tion, the distinction will be irrelevant, particularly in light of the Restatement's explanation that "[g]enerally, the case [of intentional infliction of emotional distress] is one in which the recitation of the facts to an *average member of the community* would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " Restatement (Second) of Torts § 46, cmt. d (1965) (emphasis added). We retain *Samms'* formulation of outrageousness to prevent any apprehension that we limit the tort of intentional infliction of emotional distress to

conduct that offends "all possible bounds of decency," an unrealistic and impossible standard. However, we stress that although our formulation differs slightly from the Restatement's, this difference is only a concession to the reality that no court would or could establish that certain conduct exceeds "all possible bounds of decency." We have in no way softened the Restatement's requirement of extraordinarily vile conduct, conduct that is "atrocious, and utterly intolerable in a civilized community." *Id.*

intentional infliction of emotional distress through retaliatory harassment, thereby meriting the opportunity to establish all the elements of this tort before the finder of fact. The trial court erred in granting summary judgment on the nonpreempted portion of that claim.

In sum, we hold as follows: First, both employees covered by just-cause employment contracts and employees who are at-will can assert a claim in tort for discharge in violation of public policy; second, the UADA preempts only Retherford's claim for discharge in violation of public policy; third, the LMRA preempts Retherford's claims for breach of implied contract and malicious interference with contract, and partially preempts her claim for intentional infliction of emotional distress; fourth, the statute of limitations does not bar Retherford's claim for negligent employment and the nonpreempted portion of her claim for intentional infliction of emotional distress; and fifth, Retherford has stated a claim for intentional infliction of emotional distress. Consequently, we affirm the summary judgment in part, reverse in part, and remand for disposition consistent with this opinion.

HALL, C.J., and DURHAM, J., concur.

HOWE, Associate Chief Justice: (concurring with reservation).

I concur in the majority opinion with the following reservation:

I would not reach the question whether Retherford can pursue a tort action for discharge in violation of public policy and also a claim for breach of her collective bargaining agreement's just-cause provision. It is not necessary to resolve this issue because assuming such tort cause of action exists, it is preempted by UADA, as explained in the majority opinion.

The majority holds that Retherford could pursue both a tort action and a contract claim, except for the preemption. Not only would this be duplicative, at least in part, but it possibly may violate the collective bargaining agreement, which requires that all grievances arising out of or resulting from the dismissal of a regular employee

must be arbitrated. I therefore prefer to reserve judgment on this issue.

STEWART, J., concurs in the result.